THE REPUBLICAN PARTY OF TEXAS and Thomas W. Pauken, State Chairman, and Barbara Jackson, Executive Director, Relators,

v.

The Honorable John K. DIETZ, Respondent.

No. 96–0555.

Supreme Court of Texas.

Argued June 19, 1996.

Decided Feb. 28, 1997.

Lalon C. Peale, William Charles Bundren, Dallas, for Relators.

J. Patrick Wiseman, Austin, for Respondent.

ABBOTT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT, CORNYN, ENOCH, OWEN and BAKER, Justices, joined.

On June 14, 1996, a Travis County district court issued a temporary injunction that essentially required the Republican Party of Texas to provide a convention booth and program advertisement space to the Log Cabin Republicans at the 1996 Republican Party of Texas Convention. In a per curiam opinion issued on June 19, 1996, we stayed the district court's temporary injunction because we were "tentatively of the opinion that state action is required for there to have been a violation of the constitutional rights asserted by the Log Cabin Republicans and that such action was not present under the facts of this case; that the contract claims of the Log Cabin Republicans do not warrant the relief granted by the district court; and that mandamus relief may be appropriate under the unique and compelling circumstances of this case." 924 S.W.2d 932, 932–33. The stay order was premised on considerations similar to those that led the United States Supreme Court to issue a stay in *O'Brien v. Brown,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972)(per curiam), including the importance of the questions presented, the limited time before the controversy would be mooted, whether irreparable injury would occur in the absence of a stay, and the probability that the lower court was in error. *Id.* at 3, 92 S.Ct. at 2719–20. We retained jurisdiction to issue an opinion explaining in detail the rationale for the stay order.

I

The Log Cabin Republicans of Texas and the Texas Log Cabin Republicans, Inc. (collectively LCR) are Texas non-profit corporations of Republicans who support equal civil rights for gay and lesbian individuals. In April 1996, LCR applied for an exhibitor's booth at the 1996 Republican Party of Texas Convention which began on June 20. As part of the booth application, LCR agreed to abide by the rules and regulations issued by the Republican Party of Texas for the convention. One of these rules allowed the Republican Party "the right to restrict exhibits

which, because of undue noise, method of operation, material, content, or any other reason, become objectionable."

The Exhibits Chairman for the convention orally informed LCR's President, Dale Carpenter, that the group's booth application was approved. The Republican Party also cashed the $400 check Carpenter submitted for the booth. On May 15, 1996, LCR submitted to the Republican Party an advertisement to be included in the convention program along with a $750 check for the cost of the advertisement. The advertisement asserted LCR's beliefs that equal rights should be provided for gay and lesbian individuals. On May 21, 1996, the Republican Party Executive Director sent a letter to LCR rejecting the advertisement and the booth request. The Party returned the $750 check and refunded the cost of the booth.

On May 30, 1996, LCR filed this lawsuit in Travis County seeking injunctive relief. LCR alleged that the Republican Party's actions unconstitutionally infringed upon LCR's rights to free speech, equal rights, and due course of law under the Texas Constitution. LCR also claimed a right to specific performance of its contract with the Republican Party of Texas for a booth and an advertisement. The district court held a hearing on Friday, June 14, 1996. At the conclusion of the hearing, the court issued a temporary injunction precluding the Republican Party from refusing to provide the booth and advertisement.

On Monday, June 17, 1996, the Republican Party filed with this Court a motion for leave to file a petition for writ of mandamus and an emergency motion to stay the district court's temporary injunction order. The next day, we requested an expedited response from LCR, and set oral argument for June 19, 1996—one day before the convention began. After hearing oral argument, we granted the emergency stay in a per curiam opinion. We now explain why we concluded that the Republican Party was entitled to extraordinary relief.

## II

■ Mandamus is an "extraordinary" remedy that is "available only in limited circumstances." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992). Mandamus relief is appropriate "only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). In analyzing whether the Republican Party was entitled to mandamus relief, we must determine whether the district court clearly abused its discretion in granting LCR an injunction and whether the Republican Party had an adequate remedy at law.

## A

The district court's injunction was based on a finding that LCR would probably prevail on its breach of contract claims and its free speech, equal rights, and due course of law claims under the Texas Constitution.[1] The Republican Party urges that LCR's state constitutional claims cannot be maintained because the Party's conduct did not constitute "state action." The Party further argues that there is no basis for LCR's breach of contract claims.

### 1. *STATE ACTION*

Under the "state action" doctrine developed by the federal courts, the United States constitutional guarantees of free speech, equal protection, and due process impose restrictions or obligations only on "state actors." As such, United States constitutional civil rights protect only against governmental action, either actual or constructive, in the shape of laws, customs, or judicial or executive proceedings.[2] The rights and liberties

1. LCR did not assert any cause of action arising under the United States Constitution.

2. *See, e.g., Civil Rights Cases*, 109 U.S. 3, 17, 3 S.Ct. 18, 25–26, 27 L.Ed. 835 (1883); *see also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971–72, 32 L.Ed.2d 627 (1972)(there is a "distinction between private as distinguished from state conduct set forth in *The Civil Rights Cases* and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations,' *Reitman v. Mulkey*, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967), in order for the discrimina-

guaranteed by the United States Constitution therefore "erec[t] no shield against merely private conduct." *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948); *see also Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976).

However, LCR's claims do not arise under provisions in the United States Constitution; rather, LCR's causes of action are based on guarantees contained in article I of the Texas Constitution, which is known as the Texas Bill of Rights. Thus, we must decide whether the "state action" doctrine applied in federal courts is required for a party to maintain a claim for a violation of the Texas free speech, equal rights, and due course of law guarantees. Several Texas courts of appeals have concluded that some quantum of state action is required before a litigant can maintain a lawsuit for the deprivation of a Texas constitutional right, *see, e.g., Weaver v. AIDS Services of Austin, Inc.,* 835 S.W.2d 798, 802 (Tex.App.—Austin 1992, writ denied); *Jones v. Memorial Hosp. System,* 746 S.W.2d 891, 894–95 (Tex.App.—Houston [1st Dist.] 1988, no writ); but this Court has never squarely confronted the issue before today. *See Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 844 S.W.2d 198, 203 n. 1 (Tex.1992)(Gonzalez, J., concurring & dissenting)("The application of the state action doctrine to the Texas Constitution has not been conclusively established by this Court.").

#### (a)

■ We first turn our attention to whether the constitutional claims advanced by LCR require state action. When interpreting our state Constitution, we rely heavily on its literal text, *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex.1989), and are to give effect to its plain language. *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148 (Tex.1995). We also may consider such

things as the purpose of the constitutional provision, the historical context in which it was written, the collective intent, if it can be ascertained, of the framers and the people who adopted it, our prior judicial decisions, the interpretations of analogous constitutional provisions by other jurisdictions, and constitutional theory. *See City of Sherman v. Henry,* 928 S.W.2d 464, 472 (Tex.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1098, 137 L.Ed.2d 230 (1997); *see also Davenport v. Garcia,* 834 S.W.2d 4, 10 (Tex.1992); *Ex parte Tucci,* 859 S.W.2d 1, 18 n. 3 (Tex.1993)(Phillips, C.J., concurring)(quoting *Davenport,* 834 S.W.2d at 30 (Hecht, J., concurring)).

■ The text of our state charter demonstrates that the guarantees of the Texas Bill of Rights generally apply only against the government. The Texas Constitution contains a specific provision, article I, section 29, that defines the scope and application of the Texas Bill of Rights. Section 29 is titled "Provisions of Bill of Rights excepted from powers of government; to forever remain inviolate" and provides as follows:

> To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

TEX. CONST. art. I, § 29. The first clause of section 29 establishes that the purpose of the Texas Bill of Rights is to "guard against transgressions of the high powers" delegated to the state government by the Texas Constitution. Nowhere does the Texas Constitution contain similar language indicating an intent to have the Bill of Rights generally guard against transgressions by individuals. Further, the provisions in section 29 excepting everything in the Bill of Rights "out of

tory action to fall within the ambit of the constitutional prohibition."); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)("It is clear, as it always has been since the *Civil Rights Cases,* ... that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have

become involved in it."); *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948)("Since the decision of this Court in the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States.").

the general powers of government" and providing that "all laws" contrary to the Bill of Rights shall be void demonstrates that the Bill of Rights serves as a shield against the powers and laws of government. Similar protections do not exist for actions by private individuals.

Our conclusion is buttressed by two prior decisions of this Court which recognized that the Texas Bill of Rights establishes limitations on the powers of government. In *Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007 (Tex.1934), we stated that the Bill of Rights "consists of *express limitations of power*" on the legislature, executive officers, and the judiciary. *Id.* at 1009 (emphasis in original). More recently, we held in *City of Beaumont v. Bouillion* that a law conflicting with rights guaranteed by the Texas Bill of Rights is void "because the Bill of Rights is a *limit on State power.*" 896 S.W.2d at 149 (emphasis added).[3]

3. Although neither case dealt with the concept of state action, the opinions are nevertheless significant for acknowledging that the Texas Bill of Rights serves as a restriction on government.

4. *See* footnote 2, *supra.*

5. There are, however, a handful of states that have determined that their free expression guarantees can be asserted against privately-owned shopping centers and universities. *See Bock v. Westminster Mall*, 819 P.2d 55, 60 (Colo.1991); *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341, 346–48 (1979), *aff'd on other grounds*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *State v. Schmid*, 84 N.J. 535, 423 A.2d 615, 626–30 (1980), *cert. dismissed*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982); *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 138 N.J. 326, 650 A.2d 757, 774–77 (1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 62, 133 L.Ed.2d 25 (1995); *Fred Meyer, Inc. v. McDonald*, 112 Or.App. 321, 828 P.2d 1054, 1055 (1992); *see also Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382, 1390–91 (1981); *but see Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Ins. Co.*, 512 Pa. 23, 515 A.2d 1331, 1334–36 (1986). These decisions have been based on two primary factors: (1) the unique character of such businesses in contemporary society as the functional equivalent of the traditional town square, where historically the public's free expression rights were exercised; and (2) the state constitution's free speech guarantee being phrased in affirmative language, i.e., "every person shall be at liberty to speak," rather than in the familiar negative language of the First Amendment to the United States Constitu-

Separate from the actual text, there is no indication that our Constitution's framers intended that the free speech, equal rights, and due course of law guarantees of the Texas Bill of Rights would apply to purely private conduct. Instead, the framers appear to have borrowed liberally from the federal Bill of Rights and the bills of rights in other state constitutions. *See generally* Ericson, *Origins of the Texas Bill of Rights*, Vol. LXII, No. 4, S.W. HIST. Q. 457, 457–58 (1959); *see also* Cornyn, *The Roots of the Texas Constitution: Settlement to Statehood*, 26 TEX. TECH L. REV. 1089, 1127 (1995); *cf. Ex parte Tucci*, 859 S.W.2d at 29 (Phillips, C.J., concurring). As noted previously, the federal courts have consistently applied the state action principle.[4] Moreover, we are not aware of any sister state that has generally applied its constitutional guarantees to regulate private conduct.[5] Accordingly, the bills

tion that "Congress shall make no law ... abridging the freedom of speech." While both the California and New Jersey Supreme Courts stated in their decisions that "state action" was not required under their free expression guarantee, these decisions have been limited to their facts and only applied to free speech claims made against large shopping centers and similar public enterprises. Accordingly, the California and the New Jersey Supreme Courts have not totally disregarded the concept of state action since state action is still required by both states for other constitutional claims and perhaps even for free expression claims against all other types of business enterprises.

Conversely, a greater number of state courts have determined that free speech rights can only be asserted against private property owners when the property has assumed all the characteristics of a municipality, in accord with the United States Supreme Court's decision in *Hudgens v. NLRB*, 424 U.S. 507, 516–21, 96 S.Ct. 1029, 1034–37, 47 L.Ed.2d 196 (1976). *See, e.g., Fiesta Mall Venture v. Mecham Recall Committee*, 159 Ariz. 371, 767 P.2d 719, 723 (App.1988); *Cologne v. Westfarms Assocs.*, 192 Conn. 48, 469 A.2d 1201, 1207–10 (1984); *Citizens for Ethical Gov't, Inc. v. Gwinnett Place Assocs.*, 260 Ga. 245, 392 S.E.2d 8, 10 (1990); *Estes v. Kapiolani Women's & Children's Med. Ctr.*, 71 Haw. 190, 787 P.2d 216, 221 (1990); *People v. DiGuida*, 152 Ill.2d 104, 178 Ill.Dec. 80, 604 N.E.2d 336, 344 (1992); *State v. Lacey*, 465 N.W.2d 537, 539–40 (Iowa 1991); *Woodland v. Michigan Citizens Lobby*, 423 Mich. 188, 378 N.W.2d 337, 344–48 (1985); *SHAD Alliance v. Smith Haven Mall*, 66 N.Y.2d 496, 498 N.Y.S.2d 99, 488 N.E.2d 1211, 1214–17 (1985); *Eastwood Mall v. Slanco*, 68

of rights from which the Texas framers borrowed have been construed to provide for state action, and there is no indication that our framers intended otherwise.

▮▮▮ Our holding today is consistent with well-reasoned constitutional theory. A "constitution" has been defined as "a charter of government deriving its whole authority from the governed." BLACK'S LAW DICTIONARY 311 (6th ed. 1990). In essence, a constitution is a compact between the government and the people in which the people delegate powers to the government and in which the powers of the government are prescribed. *See* THE ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY ix (Michael G. Kammen ed., 1986).[6] Bills of rights are often included as part of this compact between governments and citizens and are intended to protect citizens from governmental transgressions of certain fundamental rights. *See* COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 176 (1868); *see also* BRADEN ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 2–3 (1977). They are not designed, however, to protect from the invasion of such rights by individuals. Indeed, as noted by one constitutional scholar, enforcing constitutional guarantees against private individuals would actually restrict liberty because it would deny individuals "the freedom to make certain choices, such as choices of the persons with whom they will associate." TRIBE, AMERICAN CONSTITUTIONAL LAW § 18–2, at 1691 (2d ed. 1988).

Accordingly, based on the text of the Texas Bill of Rights, its history and purpose, our prior judicial decisions, the law in other jurisdictions, constitutional theory, and the concern for the liberty of all Texas citizens, we conclude that state action is required before a litigant can maintain a claim for deprivation of a right secured by the free speech, equal rights, and due course of law guarantees of the Texas Bill of Rights.

(b)

▮▮▮ Having concluded that "state action" is required, we must now consider how to apply the principle. Generally, state action is only present for otherwise private conduct when the conduct can be fairly attributed to the government. *See generally Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982). Determining whether the government is sufficiently involved in the challenged conduct requires us to make a legal determination based upon the circumstances of each case. In some cases, disputed facts regarding the extent of the government's involvement must be resolved by the trier of fact; however, the ultimate determination of whether the facts are sufficient to constitute state action is a question of law.

Federal court decisions provide a wealth of guidance in our resolution of state action issues. *See generally Davenport v. Garcia,* 834 S.W.2d 4, 20 (Tex.1992)("Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful...."). Among the variety of circumstances under which the federal courts have analyzed state action,

Ohio St.3d 221, 626 N.E.2d 59, 61–62 , *cert. denied,* 513 U.S. 933, 115 S.Ct. 329, 130 L.Ed.2d 288 (1994); *State v. Felmet,* 302 N.C. 173, 273 S.E.2d 708, 712 (1981); *Charleston Joint Venture v. McPherson,* 308 S.C. 145, 417 S.E.2d 544, 548–49 (1992); *Southcenter Joint Venture v. National Democratic Policy Comm.,* 113 Wash.2d 413, 780 P.2d 1282, 1285–92 (1989); *Jacobs v. Major,* 139 Wis.2d 492, 407 N.W.2d 832, 839 (1987).

In this case, LCR never alleged that it was entitled to a temporary injunction on the basis that the Texas Constitution's free speech guarantee applied on private property. Moreover, neither party has briefed nor argued this point to this Court. Accordingly, it would be inappropriate to resolve this complex issue under the facts

before us. *See generally Ex parte Tucci,* 859 S.W.2d 1, 16 n. 1 (Tex.1993)(Phillips, C.J., concurring).

6. The framers of the Texas Constitution apparently shared the belief that a constitution was a compact between the government and its citizens. TEX. CONST. art I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit."); DEBATES OF THE TEXAS CONVENTION at 330 (William F. Weeks, reporter)(1846)("We are ... about to form a new government.... Then, as I believe, we are just in the position of a people in a natural state of society, about to form a social compact; ...")(remarks of delegate Isaac Van Zandt).

several decisions have considered the circumstances under which a political party (such as the Republican Party of Texas) is a state actor.

In the *White Primary Cases*,[7] the Supreme Court considered whether the Texas Democratic Party could exclude African-Americans from voting in its primaries. In prohibiting such exclusions, the Court declared that political parties were state actors when they held primary elections. While state action may exist when political parties exercise the "traditional government function" of conducting elections, it is not true that every act of a political party is state action. As one commentator has observed:

> The idea of parties as "public" is in tension not only with the everyday recognition that parties are not government agencies, but also with the need to assure that the party system maintains a basic autonomy from the state so that the parties may serve as vehicles for expressing the public's needs and sentiments. Such autonomy distinguishes democracies from authoritarian systems, . . .

Lowenstein, *Associational Rights of Major Political Parties: A Skeptical Inquiry*, 71 TEX. L. REV. 1741, 1750 (1993).

Accordingly, federal courts have held that some party activities, such as holding elections, are public state action, while other activities are private. In *Seergy v. Kings County Republican County Comm.*, 459 F.2d 308, 314 (2d Cir.1972), the Second Circuit declined to extend "the Equal Protection requirement of the Fourteenth Amendment to . . . the county committee in the conduct of its internal party affairs which have no direct relation to the electoral process." Similarly, in *Lynch v. Torquato*, 343 F.2d 370, 372 (3d Cir.1965), the Third Circuit held that "the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices or the filling of these offices state action." In *Kay v. New Hampshire Democratic Party*, 821 F.2d 31, 33 (1st Cir.1987), the First

Circuit held that the New Hampshire Democratic Party did not engage in state action in holding a presidential candidates' forum because the forum was not an integral part of the election process. Accordingly, the Democratic Party had the absolute right to exclude a Democratic presidential candidate from the forum, even though the candidate had originally been invited to participate. *Id.* The Sixth Circuit concluded in *Banchy v. Republican Party of Hamilton County*, 898 F.2d 1192, 1196 (6th Cir.1990), that the election of party ward chairmen was not state action because there was no evidence that the chairmen played an "integral part" in the election process. *See also Valenti v. Pennsylvania Democratic State Comm.*, 844 F.Supp. 1015, 1018, 1020 (M.D.Pa.1994)(holding that the Democratic Party was not a state actor when holding an endorsement meeting; accordingly, the Party could preclude a gubernatorial candidate from disseminating certain materials from his boot3, 1018–19 (D.Neb.1991))(holding that removal of county officers of Republican Party was not state action but merely an internal party affair). *See also generally* EPSTEIN, POLITICAL PARTIES IN THE AMERICAN MOLD 190 (1986)(noting that the different responses by courts to cases involving party activities can only be explained by "distinguishing between two kinds of party activities, those that the state can constitutionally control as elements in its election process and those that it cannot so control because they are private associational affairs.").

We agree that a political party is a state actor in some instances, such as when it is conducting elections, but a private organization in other instances, such as when it is conducting certain of its internal affairs. We must determine where, along this spectrum, the Republican Party's conduct falls. We hold that the actions of the Republican Party in denying LCR the booth and advertisement were mere internal party affairs. The stated purpose of LCR in attempting to obtain a booth and advertising space was to work toward changing the Party's internal plat-

---

**7.** *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *Grovey v. Townsend*, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292 (1935).

form. However, a Party's platform is not an element of the electoral process. Party candidates are free to accept in part and reject in part the platform, and there is no requirement that a party member adhere to all portions of the platform. While there are many provisions of the Texas Election Code regulating the conduct of political parties, these provisions do not regulate or even require that a political party have a platform. *See* TEX. ELEC.CODE §§ 161–192.

The fact that the Republican Party has adopted by reference the Texas Constitution "in so far as [it] may be applicable" does not affect our analysis. As we have held, the free speech, equal rights, and due course of law provisions of the Texas Bill of Rights are only applicable when state action is present; thus, the fact that the Party agreed to abide by the Constitution when "applicable" does not change the controlling issue. Because the Republican Party's conduct in denying LCR a booth and advertisement at the convention is an internal party affair rather than an integral part of the election process, the Republican Party is not a state actor under the undisputed facts of this case. Therefore, LCR cannot maintain its state constitutional claims against the Party, and the district court abused its discretion in issuing an injunction based on these claims.

### 2. CONTRACT CLAIMS

The district court's injunction was also based on LCR's contractual claims. However, even if LCR prevailed on those claims, LCR would not be entitled to the injunction issued by the district court. The district court ordered the Republican Party:

> to desist and refrain from denying [LCR] access to booth 410 or refusing in any way to accommodate [LCR] in the occupation of that booth and from refusing to print and circulate an insert to be placed in each and every convention program in the same size, type, text and print as the convention program....

LCR acknowledges, however, that in submitting the booth application, it agreed to abide by the rules and regulations issued by the Republican Party of Texas for the convention. One of these rules allowed the Republican Party "the right to restrict exhibits which, because of undue noise, method of operation, material, content, or any other reason, become objectionable." LCR also concedes that the application form for advertisements provided: "All ads subject to approval by the Officials Committee of the Republican Party of Texas." LCR was undisputedly aware that advertisements had to be approved; the correspondence accompanying LCR's proffered advertisement stated that "if for some reason the ad is not accepted for publication in the program, please return the check to the above address." Accordingly, even if LCR prevailed on its contract claims, the Party retained the contractual right to restrict LCR's booth and approve its advertisement. The district court's injunction therefore afforded LCR more relief than it was entitled to, even by LCR's own allegations. The district court thus abused its discretion in granting this injunction to LCR. We express no view, however, on whether LCR is entitled to other relief on its contract claims.

### B

We now consider whether the Republican Party is entitled to challenge the trial court's injunction by mandamus in this Court. Generally, mandamus relief is unavailable when a relator has an adequate remedy by ordinary appeal. *See Walker*, 827 S.W.2d at 840. LCR argues that the Republican Party is not entitled to mandamus relief because it should have filed an accelerated appeal in the court of appeals, *see* TEX. CIV. PRAC. & REM.CODE § 51.014(4); TEX.R.APP. P. 42(a)(1), or should have sought mandamus relief from the court of appeals before filing an original proceeding in this Court. TEX.R.APP. P. 121(a)(1); *LaRouche v. Secretary of State*, 822 S.W.2d 632, 633 (Tex.1992). We reject these arguments, holding that the unique and compelling circumstances of this case summon the exercise of our mandamus jurisdiction. *See Geary v. Peavy*, 878 S.W.2d 602, 603 (Tex. 1994).

The district court's injunction affected a statewide political convention and was based on claims of statewide importance. The state's highest court should determine such

issues. *See generally Sears v. Bayoud*, 786 S.W.2d 248, 249–50 (Tex.1990); *Thiel v. Harris County Democratic Executive Comm.*, 534 S.W.2d 891, 895 (Tex.1976); *cf.* TEX. ELEC.CODE § 273.061. Moreover, the Republican Party alleged that the district court's injunction violated its First Amendment rights. Although the resolution of this case does not require us to reach the Party's First Amendment claims, we note that mandamus jurisdiction may be properly invoked when First Amendment rights are at issue. *See Tilton v. Marshall*, 925 S.W.2d 672, 681–82 (Tex.1996); *Davenport v. Garcia*, 834 S.W.2d 4, 11 (Tex.1992); *see generally Corpus Christi Caller–Times v. Mancias*, 794 S.W.2d 852, 854 (Tex.App.—Corpus Christi 1990, orig. proceeding).

In *Sears*, we considered the argument that Texas Rule of Appellate Procedure 121(a)(1) requires a mandamus proceeding to be first filed in the court of appeals. *Id.* at 249. *Sears* concerned a candidate's eligibility for the Republican nomination for the office of Justice of the Texas Supreme Court. *Id.* We held that that case fell within the narrow exception allowing a mandamus proceeding to be filed in this Court without having first been filed in the court of appeals. *Id.* at 250 n. 1.

The *Sears* rationale is equally applicable in this case. The relator in *Sears* argued that the issue was one of "statewide application," that "the urgency of the time constraints" necessitated immediate review by this Court, and that if the dispute was not resolved promptly, it could become moot. *Id.* at 249–50. Because this case also presented an issue of statewide application that could have become moot without our immediate attention, we likewise hold that the Republican Party met the requirements of Rule 121(a)(1).

Finally, the quick eruption and short time frame of this constitutional controversy compelled mandamus review. The trial court issued its injunction less than a week before the convention's opening. The impending deadline limited this Court's review to little more than forty-eight hours. There was simply inadequate time for the Republican Party to seek relief in the court of appeals and for

the losing party there to still avail itself of this Court. Parties should not be confined to time-delaying battles in the lower courts in cases involving issues of statewide importance. For these unique and compelling reasons, we hold that our exercise of mandamus jurisdiction over this case is proper. *See Geary*, 878 S.W.2d at 603.

### III

We conclude that the district court abused its discretion in granting LCR a temporary injunction, thereby entitling the Republican Party to the stay order that we issued on June 19, 1996. The stay order provided the Party all the relief it was entitled to under the unique circumstances of this case. Accordingly, the Republican Party's petition for writ of mandamus is dismissed as moot.

SPECTOR, Justice, concurring.

I concur in the judgment of the Court dismissing this mandamus proceeding as moot but do not join in the Court's opinion for the reasons set out below.

### I.

Today, the majority attempts to explain—in a broad interpretation of our Texas Constitution—why the Republican Party was entitled to deny the Log Cabin Republicans a booth and advertisement at the Party's state convention. The majority's opinion holds that state action is required for equal rights, free speech, and due course of law claims under the Bill of Rights of the Texas Constitution. The majority further concludes that the Republican Party's state convention is not sufficiently related to the electoral process to render the Party's exclusion of the Log Cabin Republicans state action.

### II.

I first disagree with the majority's overbroad rationale for adopting a state action requirement for equal rights, due course of law, and free speech claims under the Texas Constitution. In the hundred and fourteen years since the United States Supreme Court first recognized a state action requirement under the federal Fourteenth Amendment,

*see The Civil Rights Cases,* 109 U.S. 3, 23, 3 S.Ct. 18, 30, 27 L.Ed. 835 (1883), this Court has never found a proper occasion to determine whether any provision of our state Bill of Rights contains a similar limitation. *See Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 844 S.W.2d 198, 203 n. 1 (Tex.1992) (Gonzalez, J., concurring and dissenting). The majority purports to "rely heavily on the constitution's literal text" and to consider "the purpose of the constitutional provision, the historical context in which it was written, the collective intent, if it can be ascertained, of the framers and the people who adopted it, our prior judicial decisions, the interpretations of analogous constitutional provisions by other jurisdictions, and constitutional theory." 940 S.W.2d at 89. Yet today, without reference to the individual language, history, or purpose of article I, sections 3, 8, 13, and 19, the majority concludes that a state action requirement for equal rights, due course of law, and free speech claims is virtually self-evident.

The majority's heavy reliance on federal state action doctrine under the federal Fourteenth Amendment and the portions of the Bill of Rights incorporated through that amendment is misplaced. Both the Fourteenth Amendment and the First Amendment, by their plain language, pertain only to governmental actions. *See* U.S. CONST. amends. I ("Congress shall pass no law ...."), XIV ("[N]or shall any state ...."). The Texas Bill of Rights contains nothing comparable to this strong language: to the extent that it is regarded as having any meaning at all, article I, section 29 has previously been read to strengthen—not to limit—the other provisions of the Bill of Rights. *See* 1 GEORGE D. BRADEN, THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 85–86 (1977). Further, the federal state action requirement is a product of the twin concerns of federalism and separation of powers within the federal government. LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 18–2, at 1691 (2d ed. 1988). These concerns relate differently to our state constitution than to the federal constitution.

The majority disregards significant differences between the language of the Texas and federal constitutions. For example, the federal Due Process Clause has a limited reach because it "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195, 109 S.Ct. 998, 1000, 103 L.Ed.2d 249 (1989). Like other state courts that have applied state free speech provisions to the acts of private parties, however, this Court has repeatedly drawn attention to the affirmative right conferred by article I, section 8:

> *Rather than a restriction on governmental interference* with speech such as that provided by the First Amendment of the United States Constitution, Texans chose from the beginning to assure the liberties for which they were struggling with a specific guarantee of an affirmative right to speak.

*Davenport v. Garcia,* 834 S.W.2d 4, 7–8 (1992) (emphasis added); *see also Ex parte Tucci,* 859 S.W.2d 1, 5 (Tex.1993) (plurality opinion); *O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 402 (Tex.1988). The majority discounts persuasive decisions by other state courts interpreting similar state constitutional provisions, merely because the Log Cabin Republicans "never alleged that [they were] entitled to a temporary injunction on the basis that the Texas Constitution's free speech guarantee applied on private property." 940 S.W.2d at 90 n. 5. Here, of course, such a claim would have been inappropriate because the Party's convention took place on public property at San Antonio's Alamodome.[1]

### III.

Even assuming a state action requirement should apply to the Log Cabin Republicans' claims, the majority does not offer a satisfactory justification for finding an absence of state action here. In construing the federal state action requirement, the United States Supreme Court has recognized that even an entirely private person may be considered a

---

1. Neither the Party nor the Log Cabin Republicans ever addressed the implications of the fact that the Party's convention took place at a public facility rather than on private property, though this fact could have been weighed in a state action analysis on a fully developed record.

state actor, when the person acts in conjunction with or obtains significant aid from the state. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 941, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961) (citation omitted).

Whether sufficient state action exists here must turn on the extent to which the Party's state convention implicates the state's authority and the electoral process. The majority recognizes that the behavior of political parties has risen to the level of state action in various circumstances. 940 S.W.2d at 92–93. Today's opinion, however, does not articulate any standard or principle that determines where the threshold for state action lies.

Based only on the facts brought to light in a brief hearing on the temporary injunction, the trial court observed that a symbiotic relationship exists between the state and a major political party, and concluded that the Log Cabin Republicans could probably demonstrate a sufficient degree of state involvement to prevail on their constitutional claims. On the same limited record, this Court reaches the opposite conclusion.

### IV.

Political speech, the type of speech that the Log Cabin Republicans sought to exercise at the Party's convention, is integral to our democratic form of government and receives the broadest protection under the First Amendment to assure an open debate on political issues. *Cf. McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, —— – ——, 115 S.Ct. 1511, 1518–19, 131 L.Ed.2d 426 (1995). I cannot join an opinion that precipitately cuts off such a debate.