# IN THE SUPREME COURT OF TEXAS

No. 19-0234

LaDonna Degan, Ric Terrones, John McGuire, Reed Higgins, Mike Gurley, Larry Eddington, and Steven McBride, Appellants,

v.

The Board of Trustees of the Dallas Police and Fire Pension System, Appellee

ON CERTIFIED QUESTIONS FROM THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

Justice Boyd, joined by Justice Green, dissenting.

On January 9, 2020, Governor Greg Abbott posted on Twitter to celebrate "National #LawEnforcementAppreciationDay" and to thank "the men and women of law enforcement who bravely serve our communities and keep us safe."[1] That night, as winter storms approached the State, he posted another tweet, asking Texans to keep "all of Texas' first responders in their prayers."[2] The following morning, a driver lost control on an icy Lubbock highway, striking and killing Lubbock police officer Nicholas Reyna and Lubbock firefighter Eric Hill and critically injuring firefighter Matt Dawson while they were helping others who had been involved in two

---

[1] Gov. Greg Abbott (@GovAbbott), Twitter (Jan. 9, 2020, 12:03 PM), https://twitter.com/GovAbbott/status/1215363534995050496.

[2] Id. (Jan. 9, 2020, 7:00 PM), https://twitter.com/GovAbbott/status/1215468476900552705.

previous accidents.[3] Numerous Texas officials, agencies, organizations, and individuals tweeted condolences and gratitude for these first responders' commitment to public service.[4] Uniformly, the expressions were sincere, meaningful, and appropriate.

But Texans know that thoughtful expressions aren't nearly enough. When it comes to public employees' retirement and death benefits, Texans have bound their government to actively preserve what public employees have entrusted to it. In 2003, Texans ratified a constitutional amendment providing that local public retirement systems cannot retroactively "reduce or otherwise impair" a public officer's or employee's retirement benefits. TEX. CONST. art. XVI, § 66(d), (e), (f). Honoring this constitutional guarantee has proven difficult, however, as public pension systems have struggled to maintain solvency for one reason or another. *See Eddington v. Dall. Police & Fire Pension Sys.*, __ S.W.3d __, 2019 WL 1090799, at \*2 (Tex. Mar. 8, 2019).

The Dallas Police and Fire Pension System provides retirement, death, and disability benefits for roughly 9,300 police officers and firefighters. In 1993, the pension system began offering a Deferred Retirement Option Plan as an incentive to retain experienced first responders who would otherwise leave their departments when they became eligible for retirement. *See* Act of May 26, 1993, 73d Leg., 3 R.S., ch. 872, § 1, 1993 Gen. Laws 3432, 3465–67. Under the DROP, police officers and firefighters who become eligible for retirement can elect to continue serving and drawing their salary while also receiving retirement payments in the form of a monthly annuity deposited into their DROP accounts. When the officers or firefighters ultimately leave active

---

[3] KCBD Staff, *Firefighter, Police Officer Struck, Killed While Working Wreck on I-27*, KCBD, Jan. 12, 2020, https://www.kcbd.com/2020/01/11/firefighter-police-officer-struck-killed-while-working-wreck-i-/.

[4] *See* City of Lubbock (@cityoflubbock), TWITTER (Jan. 11, 2020, 3:24 PM), https://twitter.com/cityof lubbock/status/1216138816190386178.

service, they begin receiving their monthly retirement payments and can also access the funds that have accrued in their DROP accounts. As originally designed, the retirees could elect to withdraw all of their DROP funds as one single lump-sum payment, through partial lump-sum payments as needed, through self-designated equal payments over a specific period of time, or through monthly annuity payments calculated on the retiree's life expectancy.

In 2016, word got out that the pension system was substantially underfunded and might require an infusion of extra funds to honor all of its payment obligations. Hearing this news, retirees began withdrawing their DROP funds at increasing rates. In response, the pension system's board of trustees temporarily froze all DROP withdrawals and then adopted a DROP addendum restricting retirees' access to the funds in their DROP accounts. The Texas legislature eventually stepped in and amended the statute that governs public employee pension systems. TEX. REV. CIV. STAT. art. 6243a-1, § 6.14(e); *see* Act of May 30, 2017, 85th Leg., 4 R.S., ch. 318, §§ 1.01–.50, 2017 Tex. Gen. Laws 639, 639–709 (amending TEX. REV. CIV. STAT. art. 6243a-1). Under the amended statute, retirees can no longer withdraw all of their DROP-account funds or take self-designated partial payments when they leave active service; instead, subject to a few limited exceptions, the only way they can access their DROP-account funds is through monthly or annual annuity payments based on their life expectancy.

The appellants in this case all elected to enter the DROP when they began working for the Dallas police and fire departments. When they became eligible for retirement, they chose to remain in active service and allowed their retirement payments to be deposited into their DROP accounts. No one disputes that the funds in those accounts belong exclusively to the appellants, and not to the State or the pension system. The appellants all allege that they relied on the fact that they could

3

withdraw all or part of their DROP funds when they left active service, but the statutory amendments now prevent them from doing so.

Before the 2017 amendments, for example, Larry Eddington had more than $800,000 in his DROP account, and he planned to withdraw substantial partial payments to supplement his pension and pay additional living expenses; but now, he is limited to an annuity payment of just over $5,000 per month. LaDonna Degan requested a lump-sum distribution to cover her daughter's medical-school tuition and expenses. John McGuire needed the funds to pay for his daughter's college education and for post-retirement business activities he had planned. Mike Gurley requested a lump-sum distribution to pay tuition for his daughter's last semester of college. Ric Terrones requested distributions to pay for major home repairs. Reed Higgins relied on lump-sum withdrawals to supplement his monthly pension and to pay for major home repairs, and has now had to seek additional employment to provide for his family. Steven McBride used to take out funds two or three times a year to cover his living and home-related expenses. The funds in their DROP accounts—which they each exclusively own—remain the same, but because of the 2017 amendments, these retired first responders can no longer access the funds as provided when they opted to participate in the DROP.

The issue is whether the 2017 amendments violate article XVI, section 66 of the Texas Constitution, which prohibits pension-plan changes that retroactively "reduce or otherwise impair" the first responders' retirement benefits. TEX. CONST. art. XVI, § 66(d), (f). No one disputes that the legislature and the pension system changed the DROP withdrawal provisions as a good-faith effort to resolve an impending financial crisis. And we must presume that they "intended for the law to comply with the United States and Texas Constitutions, to achieve a just and reasonable

4

result, and to advance a public rather than a private interest." *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 381 (Tex. 2002) (citing TEX. GOV'T CODE § 311.021; *Spence v. Fenchler*, 180 S.W. 597, 605 (Tex. 1915)). "Nevertheless, the Legislature may not authorize an action that our Constitution prohibits." *Id.*

The Court concludes that the monthly retirement payments deposited into an employee's DROP account and the interest the account accrues on those funds qualify as "benefits" that section 66 protects, but the "method of withdrawal" of funds from the account does not. *Ante* at ___. Based on these conclusions, the Court holds that the 2017 amendments did not "reduce or otherwise impair" the retirees' benefits because they did not "take away an accrued or granted annuity payment," affect "the dollar amount of the funds previously credited to DROP," or "negatively affect the amount of money in" the DROP accounts, but instead "merely change[d] the method of withdrawal." *Ante* at ___.

I agree that, because the 2017 amendments did not retroactively decrease the amount of the monthly payments or prospectively lessen the amount of funds in the DROP accounts, they did not "reduce" the first responders' retirement benefits. But the Constitution guarantees that the benefits will not be "reduced *or otherwise impaired*." TEX. CONST. art. XVI, § 66(d), (e), (f). While concluding that the amendments do not "reduce" the benefits, the Court completely ignores whether the amendments "otherwise impair" the benefits.

The Constitution does not define the terms "reduce or otherwise impair," so we must consider their common, ordinary meanings. *See Anadarko Petroleum Corp. v. Hous. Cas. Co.*, 573 S.W.3d 187, 192–93 (Tex. 2019). To "reduce" is "to diminish in size, amount, extent, or number." *Reduce*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1905 (2002). "Otherwise" means

5

"in a different way or manner." *Otherwise*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1598 (2002). To "impair" is "to diminish the value of (property or a property right)." *Impair*, BLACK'S LAW DICTIONARY 754 (7th ed. 1999); *see also Impair*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1131 (2002) ("to make worse : diminish in quantity, value, excellence, or strength"). Giving effect to *all* of the Constitution's words, section 66 prohibits any change that *either* diminishes the amount of the funds in the DROP accounts *or* in some other way diminishes the value of the first responders' right to those funds.

Although the Court begins its analysis by reciting platitudes about the framers' chosen language and how courts must interpret the Constitution's words, *ante* at ___, it never actually makes any effort to interpret the words "reduce" or "impair" or to distinguish their related but different meanings. Instead, the Court lumps the two terms together and turns immediately to "contextual factors," including the provision's "purpose" and legislative history, the "conditions and spirit of the times, the prevailing sentiments of the people, the evils intended to be remedied, and the good to be accomplished." *Ante* at ___ (citing *Harris Cty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009)). While these contextual factors may be helpful, they can never replace the text itself.  We begin with and "rely heavily on the literal text," *Harris Cty. Hosp. Dist.*, 283 S.W.3d at 842, so much so that courts need not consider contextual evidence at all when the meaning of the text itself is plain. *Eddington*, ___ S.W.3d at ___, 2019 WL 1090799, at *5; *see also Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997) ("When interpreting our state Constitution, we rely heavily on its literal text and are to give effect to its plain language." (citations omitted)). Inexplicably, the Court in this case ignores the text and considers only the context instead.

6

As the Court observes, allowing access only through monthly lifetime annuity payments does not diminish the amount of funds in the DROP accounts. *Ante* at ___. But it does diminish the value of the first responders' right to those funds. Everyone agrees the first responders are the exclusive owners of the funds in their DROP accounts. These funds are "accrued" benefits—those "that have been earned by service, not those that may be earned by future service." *Eddington*, ___ S.W.3d at ___, 2019 WL 1090799, at *4. As the exclusive owners of the funds, the first responders enjoy a "bundle of rights" that includes the right to possess, use, and transfer those funds as they may wish, and to exclude others from doing the same. *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 382–83 (Tex. 2012) ("Some of the key rights in American jurisprudence that make up the bundle of property rights include the rights to possess, use, transfer and exclude others.") (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979); *United States v. Gen. Motor Corp.*, 323 U.S. 373, 378 (1945)). Prior to the 2017 amendments, the first responders had the legal right to exercise that "bundle of rights" whenever they left active service. After the amendments, they may no longer exercise their bundle of rights as they see fit. Instead, the pension system enjoys the right to possess, use, and transfer the funds as it sees fit, so long as it does not reduce the total amount of those funds. The amendments diminished the value of the funds to those who actually own them, and thus "otherwise impaired" the benefits.

As the Court notes, "nothing in Section 66's text 'suggests that *all* retirement plan terms are protected benefits.'" *Ante* at ___ (quoting *Eddington*, ___ S.W.3d at ___, 2019 WL 1090799, at *4-*5) (emphasis added). A prospective-only change in the formula for calculating the amount of future payments, which does not in any way reduce or impair the payments that have already been earned, does not violate section 66. *Van Houten v. City of Fort Worth*, 827 F.3d 530, 538 (5th

7

Cir. 2016). Nor does a prospective-only change in the interest rate those funds may earn in the future. *Eddington*, ___ S.W.3d at ___, 2019 WL 1090799, at *5. But a change that restricts or prohibits access to funds already earned does. Funds previously deposited into a first responder's DROP account are "protected benefits," and section 66 prohibits any plan-term change that retroactively "reduces or otherwise impairs" those benefits. The change at issue here did not merely prospectively alter a contractual right. Instead, it diminished the value of an accrued property right by restricting access to that property. While it did not "reduce" the amount of the funds accrued, it "otherwise impaired" those benefits in violation of section 66.

By conceding that "an outright denial of access to these funds might reasonably be considered an impairment," the Court acknowledges that the Constitution protects the first responders' *access* to the funds in their DROP accounts. *Ante* at ___. Yet contrary to the reasons the Court provides for its ultimate holding, an outright denial of access to the funds would not "negatively affect the amount of money in" the DROP accounts. *Ante* at ___. Nevertheless, the Court concedes that a denial of access would "impair" the benefits even though it wouldn't "reduce" them. Having made that concession, the only remaining question is: how much of an "impairment" does it take to violate the Constitution? Could the pension system delay all DROP-account withdrawals for a period of fifty years, or twenty-five, or ten, or two? Could it limit withdrawals to no more than $10,000, $1,000, $100, or even $10 per month?

The Constitution answers that question: neither the legislature nor the pension system may "reduce" (*diminish* the amount) or "otherwise" (in any other way) "impair" (*diminish* the value of) the funds in the DROP accounts. It does not prohibit only changes that "reduce or completely impair," or "substantially impair," or "unreasonably impair" the benefits; it prohibits changes that

8

"reduce or *otherwise* impair" the benefits. We need not engage in the kind of line-drawing to which the Court alludes, because the Constitution's text leaves no room for it.

To be sure, the 2017 amendments did not completely eliminate the first responders' DROP benefits or outright deny access to them, but that's not what the Constitution prohibits. These appellants elected to participate in the DROP, agreed to continue working once they became eligible for retirement, and permitted their retirement payments to be deposited into an account they could not access until they ultimately left active service. But they did all this under a plan that gave them the right to decide at that point whether to withdraw all of their funds, withdraw partial payments, or fund an annuity based on their life expectancy. By retroactively depriving them of that right and forcing them to accept only lifetime annuity payments, the 2017 amendments "otherwise impaired" the accrued DROP benefits by diminishing their value to their exclusive owners. Because the Court holds otherwise, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: January 31, 2020