**Barbara ROBINSON, Individually and as Representative of the Estate of John Robinson, Deceased, Appellant,**

v.

**CROWN CORK & SEAL COMPANY, INC., Appellee.**

**No. 14–04–00658–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

May 4, 2006.

Rehearing Overruled July 20, 2006.

Deborah G. Hankinson, Elana S. Einhorn, Dallas, Jeffery Mundy, Austin, for appellant.

David Crump, Frank Harmon, Kimberly Rose Stuart, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices FOWLER and FROST.

## MAJORITY OPINION

WANDA McKEE FOWLER, Justice.

At its essence, this appeal requires us to consider the breadth of the Legislature's power to curtail individual rights. John and Barbara Robinson sued Crown Cork and others after discovering Mr. Robinson had developed mesothelioma from years of working with products containing asbestos. In the trial court, Crown Cork admitted liability; however, before the court entered judgment, the Legislature enacted— and made immediately effective—a law that would preclude any recovery by the Robinsons from Crown Cork.

The Legislature, concerned about the financial toll of asbestos suits, limited the liability of corporations that (1) had purchased companies manufacturing asbestos, but (2) did not continue in the asbestos business. By making the legislation effective immediately, the Legislature affected the Robinsons' suit. Crown Cork moved for summary judgment, arguing that the legislation exempted it from paying any damages to the Robinsons because the damages it had already paid to other plaintiffs exceeded the monetary cap contained in the legislation. The trial court agreed and granted summary judgment in favor of Crown Cork.

Mrs. Robinson[1] attacks the summary judgment on three grounds, two of which are constitutional in nature. First, Mrs. Robinson claims that the legislation is unconstitutionally retroactive as applied to her because it extinguished a vested right. Next, she claims that the law is unconstitutional because it is a special law, designed specifically to aid Crown Cork. Finally, she claims that Crown Cork failed to establish as a matter of law each element of its affirmative defense.

As to Mrs. Robinson's first issue, we agree that the legislation acted retroactively upon her claims. But we do not conclude that the legislation is unconstitutionally retroactive as applied to Mrs. Robinson because it was a "valid exercise of the police power by the Legislature to safeguard the public safety and welfare...." *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 633–34 (Tex.1996).

---

[1] Mr. Robinson succumbed to his illness during the litigation in the trial court, and Barbara Robinson continued to pursue his claims under the wrongful death statute.

Regarding Mrs. Robinson's second constitutional claim—that the statute is unconstitutional because it is a special law—we conclude the statute is not a special law. Clearly it was drafted to include Crown Cork within its scope, but it was not written to exclude companies similarly situated to Crown Cork. And, because it operates on a subject in which the public at large is interested, it affects all of the citizens of the State.

Finally, we hold that Crown Cork proved the elements of its affirmative defense as a matter of law. Consequently, we affirm the trial court's judgment. We explain below.

### Factual Background

John Robinson joined the United States Navy in 1956, and served for approximately twenty years as a boiler tender on several Navy vessels. Mr. Robinson maintained boilers, pipes, steam lines, and other machinery and equipment insulated with asbestos products, including insulation products of Mundet Cork Corporation.

Crown Cork is a manufacturer and distributor of packaging products for consumer goods. In 1963, Crown Cork, then a New York corporation, was the nation's largest producer and seller of metal bottle caps, known in the industry as "crowns." Mundet also produced and sold crowns. Seeking to acquire the assets of Mundet's competing bottle cap division, in November of 1963, Crown Cork purchased the majority of Mundet stock. Approximately three months later, Mundet sold its insulation division.[2] Crown Cork continued to purchase Mundet stock until February of 1966, when the remaining assets of Mundet were transferred to Crown Cork by merger. In 1989, Crown Cork merged into a new Pennsylvania corporation of the same name.

Years later, John Robinson was diagnosed with mesothelioma. He and his wife, Barbara, sued Crown Cork, Mundet's successor, and others for damages caused by Mr. Robinson's exposure to asbestos. The Robinsons moved for partial summary judgment to establish Crown Cork's liability for the damages allegedly caused by Mundet's products. Crown Cork did not contest its liability for compensatory damages. The trial court granted the Robinsons' motion as to compensatory damages, but not as to punitive damages.

While the Robinsons' suit was pending, the Texas Legislature passed House Bill 4; House Bill 4 included a new affirmative defense limiting the liability of successor corporations for asbestos-related claims. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847. Section 17 of House Bill 4 directly impacted the Robinsons' suit. That section provides that certain successor corporations of asbestos manufacturers may limit their total asbestos liability to the total gross asset value of the predecessor company at the time of the merger or consolidation. *Id.* § 17.01. The only section of House Bill 4 made immediately effective upon its passage by two-thirds of each house of the Legislature was Section 17; it became effective on June 11, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 23.02(b), 2003 Tex. Gen. Laws 898, 899. In addition, the only section made retroactive to all cases pending on its effective date was, again, Section 17. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 17.02(2), 2003 Tex. Gen. Laws 895. Section 17 is codified at Chapter 149 of the Texas Civil Practice & Remedies Code, entitled "Limitations in Civil Actions of Liabilities Relating to Cer-

---

**2.** Mundet sold its insulation division to Baldwin–Ehret–Hill ("B–E–H") on February 8, 1964.

tain Mergers or Consolidations." *See* TEX. CIV. PRAC. & REM. CODE §§ 149.001–.006. Throughout the remainder of the opinion we will refer to Section 17 as "the Statute."

The stated purpose of the Statute is to limit cumulative "successor asbestos-related liabilities"[3] in Texas. A successor corporation is liable for asbestos claims[4] only up to the total gross assets of the transferor corporation from whom it received the asbestos-related liabilities; total gross assets are determined as of the time of the merger or consolidation. *See id.* § 149.003(a); *see also id.* §§ 149.001(4) (defining "successor" as "a corporation that assumes or incurs, or has assumed or incurred, successor asbestos-related liabili-

ties"); 149.001(5) (defining "transferor" as "a corporation from which successor asbestos-related liabilities are or were assumed or incurred").[5] A successor corporation is not responsible for successor asbestos-related liabilities that exceed this limitation. *Id.* § 149.003(a). Additionally, the Statute provides that, if a transferor corporation had assumed or incurred successor asbestos-related liabilities from a prior merger or consolidation with a transferor, then the fair market value of the total assets of the first transferor shall be used to determine the successor corporation's liability. *Id.* § 149.003(b). To the fullest extent permissible, Texas law applies to successor asbestos-related liabilities. *See id.* § 149.006 ("The courts in this state shall

---

3. "Successor asbestos-related liabilities" is defined in the Statute as:

> any liabilities, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, that are related in any way to asbestos claims that were assumed or incurred by a corporation as a result of or in connection with a merger or consolidation, or the plan of merger or consolidation related to the merger or consolidation, with or into another corporation or that are related in any way to asbestos claims based on the exercise of control or the ownership of stock of the corporation before the merger or consolidation. The term includes liabilities that, after the time of the merger or consolidation for which the fair market value of total gross assets is determined under Section 149.004, were or are paid or otherwise discharged, or committed to be paid or otherwise discharged, by or on behalf of the corporation, or by a successor of the corporation, or by or on behalf of a transferor, in connection with settlements, judgments, or other discharges in this state or another jurisdiction.

TEX. CIV. PRAC. & REM.CODE § 149.001(3).

4. An "asbestos claim" is defined in the Statute as:

> any claim, wherever or whenever made, for damages, losses, indemnification, contribu-

tion, or other relief arising out of, based on, or in any way related to asbestos, including:
(A) property damage caused by the installation, presence, or removal of asbestos;
(B) the health effects of exposure to asbestos, including any claim for:
(i) personal injury or death;
(ii) mental or emotional injury;
(iii) risk of disease or other injury; or
(iv) the costs of medical monitoring or surveillance; and
(C) any claim made by or on behalf of any person exposed to asbestos, or a representative, spouse, parent, child, or other relative of the person.

TEX. CIV. PRAC. & REM.CODE § 149.001(1).

5. The Statute provides that a corporation may establish the fair market value of total gross assets by any method reasonable under the circumstances, including (1) by reference to the going concern value of the assets or to the purchase price attributable to or paid for the assets in an arm's-length transaction; or (2) in the absence of other readily available information from which fair market value can be determined, by reference to the value of the assets recorded on a balance sheet. TEX. CIV. PRAC. & REM.CODE § 149.004(a). The fair market value of total gross assets may not reflect a deduction for any liabilities arising from any asbestos claim. *See id.* § 149.004(d). The fair market value at the time of the merger or consolidation is then adjusted as provided for inflation. *See id.* § 149.005.

apply, to the fullest extent permissible under the United States Constitution, this state's substantive law, including the limitation under this chapter, to the issue of successor asbestos-related liabilities.").

As noted previously, after the Statute became effective, Crown Cork moved for summary judgment. Crown Cork argued that it had already paid successor asbestos claims in excess of Mundet's total gross assets, and therefore, it had no further liability in any asbestos case.[6] The trial court granted the motion and severed the Robinsons' claims against Crown Cork from those against the other defendants. This appeal followed.

**Robinson's Issues**

On appeal, Mrs. Robinson raises three issues, contending the trial court erred in granting Crown Cork's motion for summary judgment because (1) the Statute violates the Texas Constitution's prohibition on retroactive laws, (2) the Statute violates the Texas Constitution's prohibition on special laws, and (3) Crown Cork failed to establish as a matter of law each element of the Statute.

**I. The Statute Does Not Violate the Texas Constitution's Prohibition on Retroactive Laws.**

In her first issue, Mrs. Robinson contends the Statute violates Article I, section 16 of the Texas Constitution. That section provides as follows: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art I, § 16. Mrs. Robinson does not contend section 16 bans all retroactive laws. Instead, she

argues *vested* rights cannot be extinguished retroactively; she maintains that an accrued cause of action is a vested right and thus not retroactively extinguishable. She asserts that her accrued tort claims were vested before the Statute became effective and therefore could not be extinguished by subsequently enacted legislation. Yet, she argues, the Statute completely eliminated the accrued tort claims against Crown Cork in contravention of section 16.[7]

We do not find the law on vested rights to be as consistent and lucid as Mrs. Robinson claims. For this reason, as we explain below, we choose not to employ a vested-rights analysis to assess the Statute's constitutionality. Instead, we conclude that we may look to the police power of the Legislature to find authority for the Statute's enactment and for its validation—in spite of its retroactivity. The Legislature may exercise its police power to balance competing individual and societal interests and to enact legislation that reasonably responds to the issues and interests before it. That power and responsibility goes to the very essence of the Legislature's role in our tripartite democratic system.

**A. The Case Law on Vested Rights is Inconsistent and Difficult to Use as a Guide.**

Courts have struggled for years to settle upon a reliable method for judging the constitutionality of a retroactive statute. Many Texas courts and courts of other states have used the designation "vested right" to describe a right that cannot be abrogated by a retroactive law. *See, e.g.,*

---

6. Sections 149.001(2) and 149.002(a) limit the Statute's application to a domestic corporation or a foreign corporation "that has had a certificate of authority to transact business in this state or has done business in this state." It is undisputed that Crown Cork meets this criteria.

7. Mrs. Robinson's challenge to the retroactive application of the Statute is an "as applied" challenge, meaning that a generally constitutional statute operates unconstitutionally as to her because of her particular circumstances. *See Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 518 n. 16 (Tex.1995).

*Middleton v. Tex. Power & Light,* 108 Tex. 96, 185 S.W. 556, 560 (1916); *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 253 (1887); *Phillips v. Curiale,* 128 N.J. 608, 608 A.2d 895, 901–02 (1992); *Peterson v. City of Minneapolis,* 285 Minn. 282, 173 N.W.2d 353, 356–358 (1969); *see also* Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 HARV. L.REV. 692, 696 (1960); Ray H. Greenblatt, *Judicial Limitations on Retroactive Civil Legislation,* 51 NW. U.L.REV. 540, 561–62 (1956). But a problem arises when one tries to define a vested right. Some Texas cases arguably have used language implying that an accrued cause of action is a vested right. *See Mellinger,* 3 S.W. at 253 ("When ... a state of facts exists as the law declares shall entitle a plaintiff relief in a court of justice on a claim which he makes against another ..., then it must be said that a right exists, has become fixed or vested, and is beyond the reach of retroactive legislation ...."); *but see Ex Parte Abell,* 613 S.W.2d 255, 261 (Tex.1981) ("[A] right cannot be considered a vested right unless it is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable to the present or future enjoyment of a demand or a legal exemption from the demand made by another."). Other cases have held that a right is not vested until a final judgment is entered. *See Walls v. First State Bank of Miami,* 900 S.W.2d 117, 122 (Tex.App.-Amarillo 1995, writ denied) (stating that "only final, nonreviewable judgments will be accorded the dignity of vested, constitutionally guarded rights...."); *Houston Indep. Sch. Dist. v. Houston Chronicle Pub. Co.,* 798 S.W.2d 580, 589 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (stating that "the triggering event for the vesting of a right is the resolution of the controversy and the final determination....").

Thus, our predicament in answering the precise question Mrs. Robinson has raised—whether her allegedly vested right was retroactively altered in an unconstitutional way—is this: no clear answer exists. For example, Mrs. Robinson declares that her tort claims were vested rights because the set of facts underlying her cause of action had already occurred. This long has been a way of describing vested rights. *See Mellinger,* 3 S.W. at 253–54. But even this designation is subject to variances in application, as the following quote, written more than seventy-five years ago, illustrates:

> One's first impulse on undertaking to discuss retroactive laws and vested rights is to define a vested right. But when it appears, as soon happens, that this is impossible, one decides to fix the attention upon retroactive laws and leave the matter of definition to follow rather than precede the discussion, assuming for the purpose that a right is vested when it is immune to destruction, and that it is not vested when it is liable to destruction, by retroactive legislation. The simplification of the task which this plan seems to involve, turns out to be something of an illusion, however, when it appears, as also soon happens, that one's preconceived notions of retroactive laws are irreconcilable with the data with which one has to deal.

Bryant Smith, *Retroactive Laws and Vested Rights,* 5 TEX. L.REV. 231, 231 (1927) (footnote omitted). Apparently, the job of ascertaining when a right is vested, and when it is not, has vexed courts and commentators for years.

**B. Some Courts Have Looked to Alternative Methods to Assess When a Statute is Unconstitutionally Retroactive.**

Courts in other states also have recognized the dilemma they confront when an

allegedly vested right is pitted against a retroactive law:

"[D]iscerning commentators and judges" have questioned the value of vested-rights analysis and have suggested that "the true test of the constitutionality of a retrospective law is whether a party has changed his [or her] position in reliance upon the existing law, or whether the retrospective act gives effect to or defeats the reasonable expectations of the parties." Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L.Rev. 692, 696 (1960) (Hochman) (footnotes omitted). Although agreeing that the parties' reasonable expectations may be relevant, Hochman has argued that the constitutionality of a retroactive statute is in fact determined by courts through a weighing of the following factors: (1) the nature and strength of the public interest served by the statute, (2) the extent to which the statute modifies or abrogates the asserted right, and (3) the nature of the right that the statute alters. *Id.* at 697. In *Rothman v. Rothman,* 65 N.J. 219, 320 A.2d 496 (1974), we applied a similar test to determine whether a retroactively-applied statute constituted a deprivation of due process. We said in *Rothman* that that analysis essentially involves asking whether, after examining the importance of the public interest served by the statute and comparing it with and balancing it against the quality and value of the right

affected by the retroactive legislation, [one could conclude] that the statute in question represented a valid exercise of police power, despite the * * * clear incursion upon individual private rights. [*Id.* at 226, 320 A.2d 496.] *See also Berkley Condominium Ass'n v. Berkley Condominium Residences, Inc.,* 185 N.J.Super. 313, 320, 448 A.2d 510 (Ch. Div.1982) (when determining what rights may become vested, "one must examine what it is that is being taken away and weigh that loss against the social gain being achieved").

*Phillips,* 608 A.2d at 902; *see also Nobrega v. Edison Glen Assoc.,* 167 N.J. 520, 772 A.2d 368, 379–83 (2001) (noting that New Jersey courts have had difficulty clearly defining "vested right" and choosing to use a "rational basis" inquiry rather than a "vested rights" inquiry).

The Texas Supreme Court also has acknowledged the quandary. *See Texas Water Rights Comm'n v. Wright,* 464 S.W.2d 642, 648–49 (Tex.1971). Justice Pope, speaking for the Court, acknowledged the confusion in the case law, noting that "[a] number of scholars have endeavored to discover the underlying rationale for the cases which either uphold or strike down a statute which is attacked as unconstitutionally retroactive." *Id.* at 649. Justice Pope then briefly discussed several alternative methods commentators have relied on to determine if a law was unconstitutionally retroactive.[8] *Id.*

---

**8.** Courts have not tested retroactive legislation only by employing a vested rights analysis. Some Texas courts and courts of other states have employed additional terminology to help them assess if a right is alterable. Some of these courts have referred to some alleged rights merely as "remedies" to illustrate what can be altered (remedy) and what cannot be altered (vested right). *See Ex Parte Abell,* 613 S.W.2d at 259–61; *Wright,* 464 S.W.2d at 648–49; *In re Goldman,* 151 N.H. 770, 868 A.2d 278, 281–82 (2005); *In re Es-*

tate of DeWitt, 54 P.3d 849, 854 & n. 3 (Colo. 2002) (en banc); *State v. MacKenzie,* 114 Wash.App. 687, 60 P.3d 607, 614 (2002); *In re Good Samaritan Hosp.,* 107 Ohio App.3d 351, 668 N.E.2d 974, 977 (1995); *Olsen v. Special Sch. Dist. # 1,* 427 N.W.2d 707, 711–12 (Minn.Ct.App.1988); Smith, 5 Tex. L.Rev. at 241 ("Rights, it has frequently been said, may not be retrospectively denied, but no man can have a vested right to a particular remedy.") (footnote omitted). To further confuse matters, other courts have held that even

In light of the inconsistency surrounding vested rights and the apparent difficulty in determining if a right is vested, we will follow Justice Pope's lead and use a gauge other than vested rights to measure the Statute's constitutionality.

## C. The Legislature's Police Power to Enact Retroactive Laws.

Facing claims that a statute unconstitutionally abrogated allegedly vested rights, a number of older Texas court of appeals opinions have resolved the issue by considering the Legislature's police power. *See, e.g., Texas State Teachers Ass'n v. State,* 711 S.W.2d 421, 424 (Tex.App.-Austin 1986, writ ref'd n.r.e.); *Ismail v. Ismail,* 702 S.W.2d 216, 222 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.); *State Bd. of Registration for Prof'l Eng'rs v. Wichita Eng'g Co.,* 504 S.W.2d 606, 608 (Tex.Civ.App.-Fort Worth 1973, writ ref'd n.r.e.); *City of Breckenridge v. Cozart,* 478 S.W.2d 162, 165 (Tex.Civ.App.-Eastland 1972, writ ref'd n.r.e.); *City of Coleman v. Rhone,* 222 S.W.2d 646, 648 (Tex.Civ.App.-Eastland 1949, writ ref'd.). The Texas Supreme Court also has done this, most recently relying on the police power to validate a retroactive statute in *Barshop v. Medina County Underground Water Conservation District,* 925 S.W.2d 618, 633–34 (Tex.1996). *Barshop* gives scant guidance on how to measure the legitimacy of an act of police power against a private right. Fortunately, a number of the courts of appeals considering the issue have written rather extensively on the balancing of rights they have performed when comparing a statute with the private right that is being altered. After looking generally at the scope of the police power, we will then follow the lead of these courts by considering the reasons the legislature enacted the Statute, including precautions taken to narrow the scope of the Statute's reach. Then, we will measure those legislative justifications against the private rights the Statute impacts.

### 1. The Legislature's Police Power.

■ Although Mrs. Robinson strenuously argues that we cannot rely on the police power to validate the Statute, we disagree. In fact, we are of the opinion that the enactment of the Statute was a reasonable exercise of the Legislature's police power.

[2] Many courts have spoken to the breadth of the police power. Though not unfettered, it is "broad and comprehensive." *Rhone,* 222 S.W.2d at 648. "It is founded upon public necessity which alone can justify its exercise" and "hinges upon the public need for safety, health, security, and protection of the general welfare of the community." *Id.*

■ When a statute is attacked as violating the retroactivity clause, the language of the clause must be balanced against the state's interest in exercising its police power. *See Texas State Teachers Ass'n v. State,* 711 S.W.2d at 425. "Although the language of the [retroactivity] clause is facially absolute, its prohibition must be accommodated to the inherent police power of the state 'to safeguard the

---

a remedy cannot be taken away entirely by a retroactive statute. *See City of Tyler v. Likes,* 962 S.W.2d 489, 502 (Tex.1997) (citing *De Cordova v. City of Galveston,* 4 Tex. 470, 480 (1849)). Each of these methods has been applied inconsistently. *See* Smith, 5 Tex. L.Rev. at 240–48. Other courts have analyzed allegedly vested rights using other factors altogether. *See Plotkin v. Sajahtera, Inc.,* 106 Cal.App.4th 953, 131 Cal.Rptr.2d 303, 310–11

(2003) (weighing the significance of the state interest served by the law and the importance of the retroactive application of law to achieve the law's purposes, the extent of reliance on the former law, the legitimacy of that reliance, the extent of actions taken on the basis of that reliance, and the extent to which retroactive application would disrupt those actions); *see also Nobrega,* 772 A.2d at 379–83.

interests of its people.'" *Id.* at 424 (quoting *Energy Reserves v. Kan. Power & Light,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)). For this reason, we must balance the two, and, for this reason, "the nature of the power being exercised by the state is important in determining whether any resulting impairment is permissible." *Id.* at 425; *see also Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951, 955 (1955) (stating that the Legislature may withdraw a common-law remedy for a well-established common-law cause of action when it is a reasonable exercise of police power in the interest of the general welfare); *Cozart,* 478 S.W.2d at 165 ("Police power is not static and unchanging. As the affairs of the people and government change and progress, so the police power changes and progresses to meet the needs.").

### 2. *The Statute's Purpose.*

■ Certainly the fiscal health of this State and its inhabitants contributes to the welfare of the citizenry and is an important concern of the public at large. The fiscal health of the State and its inhabitants were the main goals of this legislation. We quote extensively from the Statement of Legislative Intent accompanying the Statute to illustrate the reasonableness of the Statute's purpose and the Legislature's attempts to make its impact as narrow as possible:

—There was concern that the benefits of this legislation should be limited in some way to those successor corporations who were the most innocent about the potential hazards of asbestos;

—There was further concern that the benefits should be limited in some way to innocent successors who were also at the greatest financial peril, especially those threatened with bankruptcy;

—There was also concern that the legislature should test this new concept by taking one step at a time and pro-

viding realistic relief to those innocent successor corporations most at peril financially without limiting every type of asbestos liability.

In order to meet these concerns, the limitations on total liability were themselves narrowed or restricted in three ways—by two restrictions premised upon the innocence of the successor and one based upon financial viability.

To focus the benefits upon innocent successor corporations, two restrictions were added:

—Under § 149.002(a), the original transfer of successor asbestos liabilities has to have occurred prior to May 13, 1968. Of course, subsequent successors who receive only that same bundle of original asbestos liabilities through successive mergers will also be entitled to the liability limits applicable to that first successor pre–1968 no matter when the later mergers occur.

It wasn't until the mid–1960s that Dr. Irving Selikoff issued his now famous warnings about the dangers of asbestos in the workplace. The earliest date after Selikoff's warnings when even a quasi-governmental organization in the United States suggested a tighter standard for asbestos in the workplace was, however, May 13, 1968. On that date, the influential American Conference of Governmental Industrial Hygienists (ACGIH) first adopted a change in the recommended, longstanding threshold limit for asbestos in the air of a workplace from 5 mppcf to 2 mppcf (the ACGIH 1958 Standard).

A successor corporation would therefore have been much less likely to be aware of the hazards of asbestos prior to May 13, 1968. By requiring that the first transfer of asbestos liabilities to a successor occurred prior to May 13,

1968, the legislation therefore focuses its benefits upon innocent successors.

—One class of successors might, however, have been less innocent than others: those in the asbestos business. Therefore, § 149.002(b)(5) restricts the benefits of the legislation to successor corporations that did not continue the predecessor's asbestos business: the business of mining asbestos, of selling or distributing asbestos fibers, or of manufacturing, distributing, installing, or removing asbestos products. A successor that did not merge with a predecessor in order to continue that predecessor's asbestos business was less likely to have known of the hazards of asbestos. For example, a successor that was merely trying to acquire a predecessor's non-asbestos line of business would be less knowledgeable about asbestos than a successor who wanted to continue a predecessor's asbestos line of business. A successor that did not continue the asbestos business of its predecessor also could not have caused any of the injuries that arose from the discontinued asbestos business.

Together, the preceding restrictions limit the benefits of the statute to those who were more innocent than others and were unwittingly saddled with often massive longtail liabilities only because of a merger.

The third restriction in the legislation deals primarily with the issue of financial viability. Corporations actually in the asbestos business and their successors through merger have been financially drained by decades of litigation. As a result, nearly 70 such corporations have sought protection through bankruptcy. The cost in jobs and pension benefits, to cite just two examples, has been substantial. This legislation seeks to help keep remaining hard-pressed successors out of bankruptcy. In an effort to help those most in need first,

the legislation focuses upon the most hard-pressed of successors, rather than all successors. Any successor would be liable—even beyond the total gross asset value of its predecessor—for any asbestos-related premises liabilities it received from a predecessor for injuries caused on premises the successor continued to own or control after a merger. Such successors have not thus far been so financially burdened by litigation as the successors to those in the asbestos business itself. Unlike successors to those in the asbestos business, much greater insurance resources remain available to successors facing premises liability claims. In addition, successor liability for premises claims are still protected under the legislation in the case of any premises the successor did not continue to own or control after the merger. That distinction shows additional concern for successors who are likely to be more innocent of having caused any injury themselves. Such successors may also still qualify for limits upon other successor asbestos-related liabilities that are not based upon premises liability claims.

A last item worth noting is that the liability limits provided by this legislation do not apply to anyone already in bankruptcy. It is the purpose of this legislation to help keep corporations out of bankruptcy, not to assist corporations already in bankruptcy. In order to avoid encouraging any rush to force a corporation into bankruptcy in order to avoid the liability limits imposed by this legislation, the liability limits will apply if a corporation is forced into bankruptcy after April 1, 2003.

H.J. of Tex., 78th Leg., R.S. 6043–45 (2003).

3. *A Reasonable Exercise of Police Power.*

■ Courts of this State have held that two considerations determine whether a legislative act is valid under the police power: (1) whether the act is appropriate and reasonably necessary to accomplish a purpose within the scope of the police power, and (2) whether the ordinance is reasonable by not being arbitrary and unjust or whether the effect on individuals is unduly harsh so that it is out of proportion to the end sought to be accomplished. *Martin v. Wholesome Dairy, Inc.*, 437 S.W.2d 586, 591 (Tex.Civ.App.-Austin 1969, writ ref'd n.r.e.) (citing *Rhone*, 222 S.W.2d at 648). "If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment ... on a subject which lies within the police power, the courts will not hold it void." *Id.* at 592. Applying these considerations to this case, we conclude that the Statute is a reasonable exercise of the Legislature's police power.

■ First, the purpose for which it was enacted—the financial viability of the State and businesses in the State—is a valid exercise of police power. The purpose recites that nearly seventy companies have filed for bankruptcy, exacting a heavy toll in both jobs and pension benefits. Evidence before the trial court showed that asbestos lawsuits have negatively impacted Crown Cork's financial vigor. Moreover, by enacting the Statute, the Legislature impacted over 1,000 lawsuits against Crown Cork in courts across the State.[9] In addition, Crown Cork's summary judgment evidence shows that Crown Cork's financial viability alone is important to citizens in all parts of the State; its subsidiaries and affiliates have about 1,000 employees across the State, and roughly the same number of retirees relying on its continued financial viability for their own and their families' financial security as they age. The citizens of the three municipalities in which Crown Cork's plants are located across the state—Sugar Land, Conroe, and Abilene—have an interest in Crown Cork's continued financial viability. Thus, the Statute benefits the entire economy of the State, an appropriate purpose for which to exercise the police power.

Second, the Legislature limited the Statute's detrimental impact on plaintiffs such as the Robinsons so that the impact was not out of proportion to the end sought. *See Martin*, 437 S.W.2d at 591. The requirements restrict the number of corporations that qualify for the limitation of liability, and therefore leave the pool of

9. Asbestos litigation has also strained the resources of our courts. The United States Supreme Court has described the ever-increasing number of asbestos cases in our state courts as an "elephantine mass" that "defies customary judicial administration and calls for national legislation." *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (" 'The most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.' ") (quoting Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation 2–3 (Mar.1991)). The Texas Legislature recently enacted additional asbestos-related legislation in an effort to address some of the problems faced by litigants in our courts. *See* Act of May 11, 2005, 79th Leg., R.S., ch. 97, 2005 Tex. Gen. Laws 169 & § 1(e) ("An Act Relating to Civil Claims Involving Exposure to Asbestos and Silica") (to be codified at TEX. CIV. PRAC. & REM.CODE §§ 90.001–90.0012) ("Texas has not been spared this crisis. In the period from 1988 to 2000, more lawsuits alleging asbestos-related disease were filed in Texas than in any other state. Thousands of asbestos lawsuits are pending in Texas courts today.").

potential defendants as large as possible for claimants having valid claims for damages resulting from asbestos products. The Statute was limited in scope to target those corporations most in need of financial relief and/or assistance—those corporations subject to asbestos suits and payouts because they purchased companies that manufactured asbestos. The Statute also restricts its scope to those companies who are least responsible for the continued manufacture of asbestos and, therefore, least responsible for the continued negative impact of asbestos-related health problems on the public. As a result, Crown Cork was the only defendant of the number of companies the Robinsons sued that was able to take advantage of the Statute.

In short, we find the Statute (1) within the Legislature's police power and (2) narrowly tailored (a) to protect the most innocent corporations hard hit by asbestos litigation but (b) to leave the potential pool of asbestos defendants as large as possible. Although Mrs. Robinson claims that the Statute is unconstitutional, we find that her claims at most show that room for a fair difference of opinion exists as to the necessity and reasonableness of the Statute. By enacting the Statute, we conclude that the Legislature performed its unique role within our democratic system by making a judgment call on an issue uniquely within its purview and within its police power. Finding a reasonable basis for that decision, we decline to declare it void.

For these reasons, we conclude that the Statute was a valid exercise of the State's police power and that the Statute was not unconstitutionally retroactive.

### 4. *Robinson's Case Law Does Not Contradict This Conclusion.*

Mrs. Robinson argues that we cannot rely on police power to validate the retroactive effect of the statute on her accrued rights. She relies on two cases to under-

gird her argument the police power is a facile, potentially all-encompassing doctrine that we should not rely on to validate this retroactive statute. Those cases are *City of Tyler v. Likes*, 962 S.W.2d 489 (Tex.1997), and *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1 (Tex. 1999)—both Texas Supreme Court opinions involving retroactive laws that altered allegedly vested rights. In evaluating the validity of the retroactive laws in these cases, the Supreme Court did not consider the Legislature's police power. According to Mrs. Robinson, this is proof that the police power cannot be used to validate a law that has altered retroactively a vested right. We disagree because we are of the opinion that the court had alternative, and more straight-forward means of evaluating those laws.

For example, in *Likes*, the Court relied on a long-standing method of evaluating the constitutionality of a statute that retroactively abridged an allegedly vested right. Likes sued the City of Tyler for negligent maintenance of a culvert. *Likes*, 962 S.W.2d at 502. At common law, maintenance of culverts was a proprietary function for which the City of Tyler could be sued. However, the Legislature amended the Texas Tort Claims Act, reclassifying the operation of culverts as a governmental function for which property damages claims could not be brought. *Id.* By the time Likes sued the City of Tyler, the City was immune from suit for the damages. *Id.* The Court held that the statute affected a remedy only, noting that "laws affecting a remedy are not unconstitutionally retroactive unless the remedy is entirely taken away." *Id.* In the enactment of the statute, "the Legislature affected the remedy but allowed Likes a reasonable time to preserve her rights." *Id.* Because the Legislature provided Likes and others a grace period within which they could have exercised their remedy before its altera-

tion, the statute was not unconstitutionally retroactive. *See id.*

Likewise, a simple answer was available to the court in *Keco.* There, the Legislature extended the statute of limitations for a particular cause of action brought against Baker Hughes, thus making Baker Hughes potentially liable on a cause of action that would have been barred by the previous law. *Keco,* 12 S.W.3d at 2. As in *Likes,* the court relied on a firmly established rule—that a cause cannot be revived after it is barred by the statute of limitations—to hold that the legislation was unconstitutionally retroactive. *Id.* at 4; *see also Wilson v. Work,* 122 Tex. 545, 62 S.W.2d 490, 490–91 (1933); *Mellinger,* 3 S.W. at 254–55.

Thus, unlike this case, in both *Keco* and *Likes,* the Court had rather simple, straightforward answers available to it. There was no reason for the Court to consider the Legislature's police power. For this reason, we do not interpret the Court's silence on the Legislature's police power as a statement that the police power did not apply, or could not be applied, to the cases.

More importantly, the Supreme Court and other courts of this state have used the Legislature's police power to validate retroactive statutes that are allegedly unconstitutional. *See Barshop,* 925 S.W.2d at 633–34 (citing cases). In *Barshop,* the Court held, "[a] valid exercise of the police power by the Legislature to safeguard the public safety and welfare can prevail over a finding that a law is unconstitutionally retroactive." *Barshop,* 925 S.W.2d at 633–34.[10]

## D. The Pennsylvania Supreme Court's *Ieropoli* Decision is Not Persuasive.

Mrs. Robinson also urges us to apply the reasoning of the Pennsylvania Supreme Court in *Ieropoli v. AC & S Corp.,* 577 Pa. 138, 842 A.2d 919, 932 (2004), in which that court held that a similar statute enacted in Pennsylvania was unconstitutional as applied under the Pennsylvania Constitution. The *Ieropoli* court found that the statute eliminated all remedy for an accrued cause of action, and because "an accrued cause of action is a vested right," it could not be eliminated by subsequent legislation. *Id.* at 930, 932. However, in several significant ways, the *Ieropoli* decision is quite different from this appeal.

To begin with, *Ieropoli* rested on a different constitutional provision than this appeal. The plaintiff, Ieropoli, alleged that the pertinent Pennsylvania statute violated that state's open courts provision contained in the state constitution. Here, Mrs. Robinson alleges the Statute violates this state's constitutional prohibition against retroactive laws, not the open courts provision.

---

**10.** Federal courts also address many claims of allegedly unconstitutional retroactive statutes. In fact, until the 1930s, the United States Supreme Court routinely and consistently struck down retroactive statutes. *See* Jill E. Fisch, *Retroactivity and Legal Change: An Equilibrium Approach,* 110 HARV. L.REV. 1055, 1063–64 (1997); Daniel E.Troy, *Toward a Definition and Critique of Retroactivity,* 51 ALA. L.REV. 1329, 1350–51 (2000). Not until the New Deal did the Court begin to affirm the constitutionality of retroactive statutes. Fisch, 110 HARV. L.REV. at 1063–64; Troy, 51 ALA. L.REV. at 1351; see also, *Landgraf v. USI*

*Film Prods.,* 511 U.S. 244, 265–69, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (noting that the Supreme Court has given greater deference in the 1900s to legislative judgments that a statute must be applied retroactively). Since that time, the Court has been more accepting of retroactive laws. Fisch, 110 HARV. L.REV. at 1064; Troy, 51 ALA. L.REV. at 1351. Recently, however, some justices have begun to review retroactive laws in a more negative light. *See U.S. v. Carlton,* 512 U.S. 26, 39–41, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (Scalia, J., joined by Thomas, J., concurring).

Next, the Pennsylvania Supreme Court used a vested rights analysis to strike down that state's statute, pointing out Pennsylvania's unwavering historical stance, as evidenced in the case law, that an accrued cause of action is a vested right that cannot be extinguished. It appears from *Ieropoli* that Pennsylvania courts have applied vested rights analysis in a much more consistent manner than have Texas courts. As already noted, we have chosen to eschew a vested rights analysis for what we consider to be a more reliable analysis.

Finally, the most important differences appear in the statutes themselves. The Pennsylvania statute was not as narrowly drawn as the Statute. The Pennsylvania statute does not appear to have been crafted to encompass only the most innocent successor corporations. While the Statute requires that a corporation must have purchased the asbestos division before May 13, 1968 and must not have manufactured asbestos itself, the Pennsylvania statute had neither of these winnowing characteristics.

For all of these reasons, we do not find *Ieropoli* persuasive authority.

### E. Summary of Holding on Robinson's First Issue.

In summary, we hold that the Statute is not unconstitutionally retroactive as applied to Mrs. Robinson's claims because it is a valid exercise of the Legislature's police power. The Statute, therefore, does not violate Article I, section 16 of the Texas Constitution. We overrule Mrs. Robinson's first issue.

### II. The Statute is Not an Unconstitutional Special Law.

In her second issue, Mrs. Robinson contends the Statute is a special law in violation of Texas Constitution Article III, section 56. Section 56 provides in part: "where a general law can be made applica-ble, no local or special law shall be enacted." TEX. CONST. art. III, § 56(b). Mrs. Robinson contends that Crown Cork is the only beneficiary of the Statute, and the Statute singles out Crown Cork for special treatment without a reasonable public purpose. Mrs. Robinson's issue is a facial challenge, meaning that the Statute, by its terms, always operates unconstitutionally. *See Garcia*, 893 S.W.2d at 518.

### A. The Applicable Law.

A special law is defined as one " 'limited to a particular class of persons distinguished by some characteristic other than geography.' " *Ford Motor Co. v. Sheldon*, 22 S.W.3d 444, 450 (Tex.2000) (quoting *Tex. Boll Weevil Eradication Found. v. Lewellen*, 952 S.W.2d 454, 465 (Tex. 1997); *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945 (Tex.1996)). The purpose of the prohibition on special laws in Article III, section 56 is to " 'prevent the granting of special privileges and to secure uniformity of law throughout the State as far as possible.' " *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945 (Tex.1996) (quoting *Miller v. El Paso County*, 136 Tex. 370, 150 S.W.2d 1000, 1001 (1941)). In particular, it prevents lawmakers from engaging in the " 'reprehensible' " practice of trading votes for the advancement of personal rather than public interests. *Id.* (quoting *Miller*, 150 S.W.2d at 1001). A statute is not special if persons or things throughout the State are affected by it, or if it operates upon a subject in which the people at large are interested. *See Sheldon*, 22 S.W.3d at 451; *Scurlock Permian Corp. v. Brazos County*, 869 S.W.2d 478, 485 (Tex.App.-Houston [1st Dist.] 1993, writ denied) (citing *Lower Colorado River Auth. v. McCraw*, 125 Tex. 268, 83 S.W.2d 629, 636 (1935)).

In passing upon the constitutionality of a statute, we begin with a

presumption of validity. *Robinson v. Hill,* 507 S.W.2d 521, 524 (Tex.1974); *Cameron County v. Wilson,* 160 Tex. 25, 326 S.W.2d 162, 166 (1959). We presume that the Legislature has not acted unreasonably or arbitrarily, and the burden is on Mrs. Robinson, who challenges the Statute, to establish its unconstitutionality. *Robinson,* 507 S.W.2d at 524. The limits to the Legislature's authority are that the classification must be (1) broad enough to include a substantial class, and (2) based on characteristics legitimately distinguishing the class from others with respect to the public purpose sought to be accomplished by the proposed legislation. *Sheldon,* 22 S.W.3d at 450; *Maple Run,* 931 S.W.2d at 945.

 However, the "primary and ultimate" test of whether a law is general or special is whether there is a reasonable basis for the classification made by the law, and whether the law operates equally on all within the class. *Sheldon,* 22 S.W.3d at 451; *Maple Run,* 931 S.W.2d at 945. Before a statute can be struck down as violating Article III, section 56, "it must clearly appear that there is no reasonable basis for the classification adopted by the Legislature" to support the statute. *Cameron County,* 326 S.W.2d at 167. This lack of reasonable basis "should be a substantial thing and not something merely apparent but not real." *Id.*

### B. Robinson's Arguments.

Mrs. Robinson contends that the Statute was enacted to benefit Crown Cork alone, and, therefore, the Legislature's classification does not include a substantial class and is not based on characteristics legitimately distinguishing the class from others. *See Sheldon,* 22 S.W.3d at 450; *Maple Run,* 931 S.W.2d at 945. Mrs. Robinson argues that (1) the Statute is tailored to fit Crown Cork exclusively and

Crown Cork is the only company known to have taken advantage of it, (2) the Statute's narrowly defined class bears no reasonable relation to its stated purposes, and (3) a senator's comments in committee reveal the Statute to be nothing more than a prohibited "pretend" class based on an agreement to advance Crown Cork's personal interests. We address each argument in turn.

*1. Robinson Has Not Shown that the Statute Benefits Crown Cork Exclusively.*

 These are Mrs. Robinson's specific reasons for maintaining that the Statute is tailored to fit only Crown Cork:

- The Statute was modeled after similar statutes enacted to benefit Crown Cork in Pennsylvania and Mississippi; [11]
- Neither Crown Cork nor Mrs. Robinson can identify another company that has taken advantage of the Statute or the Pennsylvania and Mississippi statutes;
- The narrowing details of the Statute precisely fit Crown Cork's purchase, manufacturing, and merger history, thereby enabling only Crown Cork to fit within the Statute's limitation of liability;
- Crown Cork's valuation expert could not identify another corporation meeting the requirements; and
- Crown Cork's valuation expert used the same valuation prepared for the Pennsylvania litigation.

As we have noted, each of these specific complaints raises an issue universal to all of them: that the Statute was enacted to benefit only Crown Cork. For the reasons explained below, we disagree that these facts transform the Statute into a special law.

11. *See* 15 PA. C.S. § 1929.1 (2004); MISS.CODE ANN. §§ 79–33–1 through 79–33–11.

First, even though this is a summary judgment requiring that we view all facts in a light most favorable to Mrs. Robinson, we still must indulge " 'a strong presumption that a Legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds.' " *City of Irving v. Dallas/Fort Worth Int'l Airport Bd.,* 894 S.W.2d 456, 466 (Tex.App.-Fort Worth 1995, writ denied) (citing *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968)). In addition, the primary test is not whether the Statute does, in fact, apply to only one entity. The primary test, in actuality a two-part test, is (a) whether a reasonable basis exists for the classification, and (b) whether the law operates equally on all within the class. *Sheldon,* 22 S.W.3d at 451. Factual inquiries have a similarly taxing presumption:

[Generally,] the constitutionality of a law is not to be determined on a question of fact to be ascertained by the court. If under any possible state of facts an act would be constitutional, the courts are bound to presume such facts exist; and therefore the courts will not make a separate investigation of the facts, or attempt to decide whether the legislature has reached a correct conclusion with respect to them.

*Garcia,* 893 S.W.2d at 520 (citing *Corsicana Cotton Mills v. Sheppard,* 123 Tex. 352, 71 S.W.2d 247, 250 (Tex. Comm'n App. 1934)).

Thus, with these guidelines in mind we turn to the specific complaints. As noted, if the allegation were true that only Crown Cork fits within the Statute's restrictive details, that is not, in and of itself, proof that the Statute is a special law. Moreover, the fact that only Crown Cork has taken advantage of the law is not necessarily proof that it applies only to Crown Cork.

Even assuming that only Crown Cork can benefit from the Statute, the primary test is whether a reasonable basis exists for the classification and whether it operates equally on all within its class. Mrs. Robinson has not alleged that the statute does not operate equally on all those in its class, so the only question before us is whether a reasonable basis for the classification exists.

The policy goals underlying the Statute are expressly set out in the Statute's Statement of Legislative Intent, detailed above. The statement reflects that the rationale and purpose of the legislation was (1) "to limit the benefits of the statute to those who were more innocent than others and were unwittingly saddled with often massive long-tail liabilities only because of a merger," and (2) "to help keep remaining hard-pressed successors out of bankruptcy." H.J. of Tex., 78th Leg., R.S. 6044 (2003).

The Statement of Legislative Intent also explained the unique merger, succession and year requirements contained in the Statute. Representative Nixon, the author of House Bill 4, explained that successor corporations would have been much less likely to be aware of the hazards of asbestos prior to May 13, 1968, because

It wasn't until the mid–1960s that Dr. Irving Selikoff issued his now famous warnings about the dangers of asbestos in the workplace. The earliest date after Selikoff's warnings when even a quasi-governmental organization in the United States suggested a tighter standard for asbestos in the workplace was, however, May 13, 1968. On that date, the influential American Conference of Governmental Industrial Hygienists (ACGIH) first adopted a change in the recommended, longstanding threshold limit for asbestos in the air of a work-

place from 5 mppcf to 2 mppcf (the ACGIH 1958 Standard).

... By requiring that the first transfer of asbestos liabilities to a successor occurred prior to May 13, 1968, the legislation therefore focuses its benefits upon innocent successors.

H.J. OF TEX., 78th Leg., R.S. 6044 (2003).

Although Mrs. Robinson disputes the dates contained in the Statement of Legislative Intent and claims that the Texas Department of Health suspected at least some of the harmful impact of asbestos, a mere difference of opinion, where reasonable minds could differ—as between 1968 and 1958—is not a sufficient basis for striking down legislation. *See Garcia*, 893 S.W.2d at 520 (citing *Davis*, 426 S.W.2d at 831).

As we noted in the previous section, when we compare the purposes of the legislation with its requirements, we find the requirements tailored to serve the Statute's purposes. By enacting the Statute, the Legislature impacted many lawsuits against Crown Cork in various courts across the State,[12] and did much to ensure financial stability to the company's current workforce and pensioners. The viability of corporations and their ability to continue to provide jobs and pension benefits are matters of importance to Texas and its citizens.

The Legislature sought to ameliorate the effects of asbestos-related liabilities by limiting the amount of money innocent successor corporations are liable for in damages to the total gross asset value of the original corporation. Moreover, the Legislature sought to narrow the class to include only the most innocent of successor corporations, excluding those that continued in the asbestos business. We cannot say that there is no reasonable basis for this classification. We therefore hold that a reasonable basis exists for the Statute's classification of innocent successor corporations, like Crown Cork, burdened by asbestos liabilities. *See Sheldon*, 22 S.W.3d at 451; *Maple Run*, 931 S.W.2d at 945; *Cameron County*, 326 S.W.2d at 167; *see also City of Irving*, 894 S.W.2d at 465–67 (upholding classification applying to one airport as reasonable because it addressed a matter of statewide importance).

2. *Robinson Has Not Shown that the Statute's Class Bears No Reasonable Relation to Its Stated Purposes.*

We next turn to Mrs. Robinson's contention that the Statute's narrowly defined class bears no reasonable relation to its stated purposes. According to Mrs. Robinson, Crown Cork is not on the verge of bankruptcy, and so a class that includes only Crown Cork is not rationally related to the objective of saving "hard-pressed successors" from bankruptcy. Mrs. Robinson's argument ignores the other stated purpose of the Statute—to eliminate unfairness to innocent successor corporations—and the effect of the Statute's limitation of liability. Following the 1966 merger with Mundet, Crown Cork did not sell, distribute, or manufacture any asbestos products; yet, it has paid over $413 million to settle asbestos-related claims as a result of the merger. This amount far exceeds the fair market value of Mundet's total gross assets, which Crown Cork has calculated to be between $55.6 million and $57.5 million. Moreover, the Statute does not include any requirement that a successor corporation demonstrate that it faces impending bankruptcy. Instead, the Statute seeks to ameliorate unfairness and the threat of bankruptcy by limiting the inno-

---

12. Crown Cork represents that there are currently more than 20,000 cases in Texas alone in which Crown Cork is being sued for asbes-tos-related liabilities because it is a successor through merger or consolidation. Mrs. Robinson does not dispute this claim.

cent successor's liability to the fair market value of the total gross assets of the transferor corporation.

Thus, Crown Cork's inclusion in the class is rationally related to the Statute's stated purposes, because it will cap the amount of money Crown Cork is liable to pay out for asbestos-related liabilities resulting solely from its merger with Mundet. Beyond this, we decline to second-guess the Legislature "or attempt to decide whether the legislature has reached a correct conclusion with respect to" the facts before it. *See Garcia,* 893 S.W.2d at 520.

### 3. A Senator's Comment Does Not Reveal a "Pretend Class."

Finally, we address Mrs. Robinson's contention that a member of the Texas Senate State Affairs Committee made comments that unmask the Statute as creating a prohibited "pretend class" based on an agreed arrangement to advance Crown Cork's personal interests rather than the public welfare. *See Scurlock Permian Corp.,* 869 S.W.2d at 485 ("The class created by the statute must be a real class, and not a 'pretended' class created by the legislature to evade the constitutional restriction.") (citations omitted). During a meeting of this committee, its chair described Article 17 of House Bill 4 to the members of the committee as follows:

> Article 17, limitations in civil actions of liabilities relating to certain mergers or consolidations. This, members, is the Crown Cork and Seal asbestos issue. What we have put in this bill is what I understand to be an agreed arrangement between all of the parties in this—in this matter.

Meeting on Proposed Senate Substitute for Tex. H.B. 4, State Senate Affairs Committee, 79th Leg., R.S., 13 (April 30, 2003). Although the Senator identified Crown Cork by name to describe the issue addressed by Article 17, we do not agree that this is proof positive that the Legislature has acted improperly to benefit Crown Cork's private interests exclusively.

In *Juliff Gardens,* the appellant made a similar argument that the legislative history of a statute evidenced a legislative effort to prevent it from building a particular landfill. *Juliff Gardens, L.L.C. v. Tex. Comm'n on Envtl. Quality,* 131 S.W.3d 271, 283 (Tex.App.-Austin 2004, no pet.). The court, after reviewing the legislative history, rejected this argument, explaining that "[w]hen reviewing a statute to determine whether it is an unconstitutional local or special law, we review the reasonableness of the statute's classifications, ... not the precipitating forces that led to its enactment." *Id.* The court reasoned that merely because the appellant's proposed landfill and the subsequent community opposition to it may have initiated the senator to sponsor the proposed legislation, that did not render it a prohibited local or special law. *Id.* at 284.

Similarly, the senator's brief mention of Crown Cork as a beneficiary of the Statute—in a single paragraph of a fifteen-page transcript—demonstrates at most that Crown Cork's situation may have provided the impetus for its passage. It does not, as Mrs. Robinson suggests, demonstrate that the Legislature acted improperly to evade constitutional requirements.

In light of our foregoing discussion, we overrule Mrs. Robinson's second issue.

### III. Crown Cork is Entitled to Summary Judgment.

In her third issue, Mrs. Robinson contends that she raised a fact question about whether Crown Cork continued Mundet's asbestos business for several months after acquiring it. The existence of this fact question, Mrs. Robinson argues, prevents Crown Cork from showing that it is entitled to the Statute's limitation

of liability as a matter of law. Summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). In considering this issue, we use the well-established standards of review for traditional summary judgments. *See* Tex.R. Civ. P. 166a; *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548–49 (Tex. 1985).

■■■ The Statute's limitation of liability does not apply to "a successor that, after a merger or consolidation, continued in the business of . . . manufacturing, distributing, removing, or installing asbestos-containing products which were the same or substantially the same as those products previously manufactured, distributed, removed, or installed by the transferor." Tex. Civ. Prac. & Rem.Code § 149.002(b)(5). Mrs. Robinson contends that, after Crown Cork acquired a majority of stock in Mundet—but before the 1966 merger—Crown Cork continued Mundet's asbestos-related business as a division of Crown Cork.

Mrs. Robinson points to the following evidence. First, a now-deceased former Mundet employee, who was in charge of Mundet's Houston operation at the time of the acquisition, testified in another case that all the Mundet employees he knew went to work for Crown Cork, and that for about three months Crown Cork continued to sell, contract for, and fill orders for Mundet products—including those containing asbestos. Second, Mrs. Robinson points out that the 1964 bill of sale in which Mundet sold its insulation division to B–E–H referred to Mundet as "a Division of Crown Cork & Seal," and was signed by Crown Cork's chairman of the board on behalf of "Mundet Cork Corporation, a Division of Crown Cork & Seal Company, Inc."

Mrs. Robinson's evidence, however, does not raise a fact question on whether Crown Cork is entitled to take advantage of the Statute's limitation of liability, because it predates the 1966 merger of Crown Cork and Mundet, and the plain language of the Statute provides that it does not apply when the transferee corporation continues the asbestos-related business of the transferor company "*after* a merger or consolidation." *See* Tex. Civ. Prac. & Rem.Code § 149.002(b)(5) (emphasis added). Thus, evidence related to Crown Cork's and Mundet's activities before the merger is irrelevant to whether Mrs. Robinson's claims constitute "successor asbestos-related liabilities" that are limited by the Statute. Indeed, section 149.001(3) explicitly applies the limitation of liability to all claims "that are related in any way to asbestos claims *based on the exercise of control or the ownership of stock* of the corporation *before* the merger or consolidation." *Id.* § 149.001(3) (emphasis added); *see also* § 149.003.

Therefore, because Mrs. Robinson's evidence all relates to events before the 1966 merger of Mundet and Crown Cork and because selling products for only three months until a division is sold does not qualify as "continuing the asbestos related business" as contemplated by the Statute, Mrs. Robinson did not raise a fact question as to whether Crown Cork continued Mundet's asbestos-related business after the merger. We conclude that Crown Cork has demonstrated its entitlement to summary judgment based on the Statute's limitation of liability.

We overrule Mrs. Robinson's third issue.

**Conclusion**

Although Mrs. Robinson and her husband appear to have had valid causes of action against Crown Cork as a successor

of Mundet Corporation, the Legislature took action uniquely within its role as the legislative branch of our government and enacted a statute it concluded was reasonably necessary. The purpose of the Statute was to minimize the statewide negative financial effects of asbestos litigation. A consequence of the Statute was to eliminate Mrs. Robinson's ability to recover against Crown Cork for her and her husband's damages. Because we hold that the Statute was a valid exercise of the Legislature's police power and that the beneficial reasons for its enactment outweigh the negative impact on Mrs. Robinson's right to address the untimely death of her husband, because we hold that the Statute benefitted the State as a whole and is not a special law, and because Mrs. Robinson failed to create a fact issue concerning the evidence Crown Cork presented to prove its affirmative defense, we overrule Mrs. Robinson's issues and affirm the trial court's judgment.

FROST, J., dissenting.

KEM THOMPSON FROST, Justice, dissenting.

In deciding whether the legislation at issue violates the prohibition against retroactive laws in the Texas Bill of Rights, the court concludes that if the Texas Legislature reasonably exercises its police power to enact a statute, then that statute does not violate the Texas Constitution, even though the statute is retroactive and destroys the vested rights of some individuals. The people of the State of Texas, in emphatic and compelling language set forth in section 29 of the Texas Bill of Rights, have expressly withheld from the Legislature the authority to enact retroactive laws in violation of section 16 of the Texas Bill of Rights. Because the Legislature has no police power to enact retroactive laws in violation of section 16, this court should not use a police-power analy-

sis to determine whether the statute is unconstitutionally retroactive. Furthermore, the weight of precedent from the Texas Supreme Court and this court requires the use of the vested-rights analysis. Under this analysis, the statute in question destroys the vested rights of the appellant in this case and therefore violates section 16 of the Texas Bill of Rights, as applied. Because the court, using a police-power analysis, reaches the opposite conclusion, I respectfully dissent.

### THE APPLICABLE TEXT OF THE TEXAS CONSTITUTION

In her first issue, Mrs. Robinson asserts that Chapter 149 of the Texas Civil Practice and Remedies Code (hereinafter "the Statute") violates section 16 of the Texas Bill of Rights as applied to her claims against appellee Crown Cork & Seal Company, Inc. In interpreting the Texas Constitution, Texas courts rely heavily on the literal text and must give effect to its plain language. *Republican Party of Texas v. Dietz,* 940 S.W.2d 86, 89 (Tex.1997). The Texas Constitution states in pertinent part:

### PREAMBLE

Humbly invoking the blessings of Almighty God, *the people of the State of Texas,* do ordain and establish this Constitution.

### ARTICLE I

### BILL OF RIGHTS

That the general, great and essential principles of liberty and free government may be recognized and established, we declare:

· · ·

§ 16. Bills of attainder; ex post facto or retroactive laws; impairing obligation of contracts

Sec. 16. *No* bill of attainder, ex post facto law, *retroactive law,* or any law impairing the obligation of contracts, *shall be made.*

. . .

§ 29. Provisions of Bill of Rights excepted from powers of government; to forever remain inviolate

Sec. 29. To guard against transgressions of the high powers herein delegated, we declare that *everything in this "Bill of Rights" is excepted out of the general powers of government,* and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

TEX. CONST. Preamble, art. I, §§ 16, 29 (emphasis added).

Every constitution of the State of Texas has contained the language currently found in sections 16 and 29 of the Texas Bill of Rights. *See* TEX. CONST. of 1869, art. I, §§ 14, 23; TEX. CONST. of 1866, art. I, §§ 14, 21; TEX. CONST. of 1861, art. I, §§ 14, 21; TEX. CONST. of 1845, art. I, §§ 14, 21. The Constitution of the Republic of Texas contained substantially similar language. *See* REPUB. TEX. CONST. of 1836, Declaration of Rights, Preamble & Sixteenth, *reprinted in* TEX. CONST. app. 482, 493–94 (Vernon 1993). Under the plain meaning of this text, "retroactive laws" shall not be made, and the people of Texas have not given the Texas Legislature any police power to enact "retroactive laws." *See* TEX. CONST. Preamble, art. I, §§ 16, 29; *Dietz,* 940 S.W.2d at 89–90 (stating that article I, section 29 of the Texas Constitution expressly limits the power of Texas government by excepting everything in the Bill of Rights out of the general powers of government and citing with approval *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007 (1934)); *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148–49 (Tex. 1995) (stating that the guarantees found in the Bill of Rights are excepted from the

general powers of government and that the state has no power to act in a manner contrary to the Bill of Rights); *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007, 1010–11 (1934) (holding that Texas Legislature has no police power to violate article I, section 16 of the Texas Constitution because section 29 emphatically and unambiguously excepts this power from the powers of the government of the State of Texas); *Fazekas v. Univ. of Houston,* 565 S.W.2d 299, 305 (Tex.Civ. App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.) (stating that, although State of Texas has a broad police power, the Texas Constitution excepts from this power the authority to enact laws contrary to article I, section 16 of the Texas Constitution); *but see Barshop v. Medina Cty. Underground Water Conserv. Dist.,* 925 S.W.2d 618, 633–34 (Tex.1996) (stating that a valid exercise of the Legislature's police power can prevail over a finding that a law is unconstitutionally retroactive); *Texas State Teachers Ass'n v. State,* 711 S.W.2d 421, 424–25 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (presuming, despite stated doubts, that teachers' certificates were vested rights for purpose of retroactivity challenge under article I, section 16 of the Texas Constitution, but stating that such rights are still subject to the Legislature's police power, without discussing section 29 of the Texas Constitution's Bill of Rights); *Martin v. Wholesome Dairy, Inc.,* 437 S.W.2d 586, 590–91 (Tex.Civ.App.-Austin 1969, writ ref'd n.r.e.) (indicating that equal rights and due course of law provisions of Texas Bill of Rights are subject to the police power without discussing section 29 or the *Marshall* case).

On many occasions over the past 160 years, the Texas Supreme Court has considered whether a given statute violates this express constitutional prohibition against retroactive laws, yet the issue presented today is not easily answered. The difficulty arises not because the issue itself

is complex but because Texas jurisprudence is a bit unclear with respect to the proper analytical framework for evaluating the constitutionality of a statute challenged under section 16 of the Texas Bill of Rights. One case from the Texas Supreme Court raises questions as to the authority of the Legislature to exercise its police power to enact a "retroactive law."

In *Barshop*, the Texas Supreme Court stated that even if a statute violates the prohibition against retroactive laws contained in article I, section 16 of the Texas Constitution, the statute is not void if it was a valid exercise of the Legislature's police power. *See Barshop*, 925 S.W.2d at 633–34. *Barshop*, however, does not contain any reference to section 29 of the Texas Bill of Rights or rest upon any Texas Supreme Court holding to support this proposition. *See id.* at 633–36. Texas Supreme Court decisions both before and after *Barshop* state that section 29 expressly limits the power of Texas government by excepting everything in the Bill of Rights out of the general powers of government. *See Dietz*, 940 S.W.2d at 89–90; *Bouillion*, 896 S.W.2d at 148–49; *Marshall*, 76 S.W.2d at 1010–11. In *Marshall*, the Texas Supreme Court held that the Texas Legislature has no police power to violate article I, section 16 of the Texas Constitution because section 29 unambiguously excepts this power from the powers of the Texas state government. *See Marshall*, 76 S.W.2d at 1010–11. Although the *Barshop* court, in conducting its analysis under the Contract Clause of the Texas Constitution, distinguished *Marshall*, it did not overrule *Marshall*. *See Barshop*, 925 S.W.2d at 633–35. Furthermore, since *Barshop*, the Texas Supreme Court, addressing this issue, has cited *Marshall*

with approval. *See Dietz*, 940 S.W.2d at 89–90.

In its Contract Clause analysis, the *Barshop* court also stated that in an 1851 precedent, *State v. Delesdenier*, the Texas Supreme Court concluded that the Contract Clause may yield to statutes necessary to safeguard the public welfare. *See Barshop*, 925 S.W.2d at 635 (citing *State v. Delesdenier*, 7 Tex. 76, 99–100 (1851)). The part of *Delesdenier* cited by *Barshop* is dicta because the court held that the statute in question affected the remedy and did not infringe on any vested rights. *See Delesdenier*, 7 Tex. at 98–101. The dicta in *Delesdenier* cited by *Barshop* is a recitation of a federal court's decision under the Contract Clause of the United States Constitution. *See* U.S. CONST. art. I, § 10 cl. 1 (stating "No state shall ... pass any ... Law impairing the Obligation of Contracts"); *Delesdenier*, 7 Tex. at 99. In a similar vein, many of the court of appeals cases cited in *Barshop* trace their reasoning back to federal Contract Clause cases. *See, e.g., Texas State Teachers Ass'n*, 711 S.W.2d at 424 (relying on and quoting federal Contract Clause case); *see also ante* at p. 529 (quoting federal Contract Clause case). As the Texas Supreme Court pointed out in *Marshall*, this reasoning is problematic. *See Marshall*, 76 S.W.2d at 1010–11. Though a court applying the Contract Clause of the United States Constitution may conclude that this clause yields to and accommodates the police power of a state to safeguard the interests of its people, this does not mean that the people of Texas are precluded from withholding certain powers from the Texas government. And that is just what the people of Texas have done in section 29.[1] *See* TEX. CONST. art. I, § 29; *Mar-*

1. In its Contract Clause analysis, the *Barshop* court also cites dicta from two courts of appeals. *See Texas Water Comm'n v. City of Fort Worth*, 875 S.W.2d 332, 335–36 (Tex.App.-Austin 1994, pet. denied) (citing *Kilpatrick* in dicta and stating that contract clause of Texas Constitution is subject to the police power but holding the statute in question does not impair contractual obligations); *Andrada v. City*

*shall,* 76 S.W.2d at 1010–11 (holding that federal Contract Clause cases deferring to the police power of the states have no application to the Texas Constitution because section 29 expressly limits the police power of Texas government, whereas the United States Constitution does not expressly limit the police power of the states); *see also Andrada v. City of San Antonio,* 555 S.W.2d 488, 491 (Tex.Civ. App.-San Antonio 1977, writ dism'd) (citing in dicta federal Contract Clause cases, one of which states that "the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising *such powers as are vested in it* for the promotion of the common weal, or are necessary for the general good of the public") (emphasis added, citing *Manigault v. Springs,* 199 U.S. 473, 480, 26 S.Ct. 127, 50 L.Ed. 274 (1905)). This court is bound by our high court's precedent; however, *Barshop* is contradicted by both prior and subsequent Texas Supreme Court precedent. In this unusual situation, it is better to follow the weight of controlling precedent.

Texas courts need a clear legal standard for determining whether a challenged statute constitutes a "retroactive law" that is impermissible under the Texas Constitution. The majority holds that a statute is not an unconstitutional retroactive law if the Texas Legislature reasonably exercised its police power in enacting the statute. This legal standard seems problematic given the structure and plain language of the Texas Constitution, which, in clear and forceful terms, expressly and unequivocally withholds from Texas government the power to enact retroactive laws. *See* TEX. CONST. Preamble, art. I, § 16 ("No ... retroactive law ... shall be made."), § 29 ("[E]verything in this 'Bill of Rights' is

excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto ... shall be void."). Under well-reasoned constitutional theory, a constitution is a charter of government that derives its whole authority from the governed. *Dietz,* 940 S.W.2d at 91. A constitution is a compact between the government and the people in which the people delegate powers to the government and in which the powers of the government are prescribed. *Id.* The Texas Constitution states that the people of Texas have not delegated to their government the power to enact any "retroactive law." Whatever shortcomings the vested-rights analysis may have, it is consistent with the structure and plain language of the Texas Constitution. Under this analysis, the Texas Legislature lacks the power to enact statutes that nullify or destroy vested rights. *See, e.g., DeCordova v. City of Galveston,* 4 Tex. 470, 473–80 (1849).

A police-power legal standard may be consistent with the structure of some other states' constitutions. But the constitutions of these states have language that is very different from the Texas Constitution. Consequently, cases interpreting these states' constitutions provide little, if any, insight in evaluating the availability and scope of the police power under the Texas Constitution. For example, the majority cites two New Jersey cases in support of its police-power analysis. *See ante* at p. 528; *Nobrega v. Edison Glen Assoc.,* 167 N.J. 520, 772 A.2d 368, 378–82 (2001); *Phillips v. Curiale,* 128 N.J. 608, 608 A.2d 895, 900–02 (1992). Unlike the Texas Constitution, the New Jersey Constitution contains no explicit prohibition against retroactive civil laws that do not impair contractual obligations or reme-

*of San Antonio,* 555 S.W.2d 488, 491 (Tex.Civ. App.-San Antonio 1977, writ dism'd) (citing federal Contract Clause cases regarding po-

lice power in case in which the statute did not apply retroactively or impair existing contractual obligations).

dies. N.J. CONST. art. IV, sec. VII, par. 3 ("The Legislature shall not pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made."). The New Jersey Constitution has no provision analogous to article I, section 29 of the Texas Constitution. *See* N.J. CONST. arts. I, IV. Therefore, unlike the Texas Legislature, the New Jersey Legislature has the general power to enact retroactive civil statutes that do not impair contractual obligations or remedies. *See Nobrega,* 772 A.2d at 378–82; *Phillips,* 608 A.2d at 900–02; *State Dep't of Envtl. Prot. v. Ventron Corp.,* 94 N.J. 473, 468 A.2d 150, 163 (1983). The only general limitation on such statutes imposed by the New Jersey Constitution is supplied by the substantive due process protection that New Jersey courts have held is implied in the New Jersey Constitution. *See* N.J. CONST. art. I, sec. 1; *Nobrega,* 772 A.2d at 378–82; *Phillips,* 608 A.2d at 900–02. The two New Jersey cases cited by the majority did not use a police-power analysis to determine what constitutes an impermissible "retroactive law" under the New Jersey Constitution; rather, these cases state that a police-power or rational-basis analysis is better than the vested-rights analysis for determining whether a statute is so unreasonable and harsh as to violate the substantive due process protections implied in the New Jersey Constitution. *See* N.J. CONST. art. I, sec. 1; *Nobrega,* 772 A.2d at 378–82 (stating that, although the vested-rights analysis had been used to determine whether a retroactive statute violates implied substantive due process, the better analysis is the deferential, rational-basis test—whether the statute is supported by a legitimate legislative purpose furthered by rational means); *Phillips,* 608 A.2d at 900–02 (stating that, in substantive due process analysis of retro-

active statute, New Jersey courts should balance the importance of the public interest as compared with the value of the right affected by the statute to determine if the legislature reasonably exercised its police power or whether it violated substantive due process by enacting particularly harsh and oppressive legislation).

In the case at hand, Mrs. Robinson does not assert a substantive due process violation; rather, she asserts that, as applied to her, the Statute violates the Texas Constitution's prohibition against enacting any "retroactive law." If the Statute falls within this category, then the Texas Legislature had no police power to enact it. Thus, in this context, it makes no sense to ask whether the Texas Legislature reasonably exercised its police power to enact a "retroactive law" because the Texas Legislature has no police power to enact such a law at all.

### PRECEDENT REGARDING THE VESTED-RIGHTS ANALYSIS

Even without considering article I, section 29, the weight of Texas precedent requires this court to apply the vested-rights analysis. In its 1843 term, the Supreme Court of the Republic of Texas used the vested-rights analysis in applying the protection against retroactive laws contained in the Constitution of the Republic of Texas. *See Taylor v. Duncan,* Dallam 514, 517 (Tex.1843). In 1849, in *DeCordova,* the Texas Supreme Court also used the vested-rights analysis in applying this provision of the Republic of Texas Constitution. *See DeCordova v. City of Galveston,* 4 Tex. 470, 473–80 (1849). At that time, our high court indicated that a "retrospective law" under the Republic of Texas Constitution had the same meaning as a "retroactive law" under the State of Texas Constitution. *See id.* at 475; *see also* TEX. CONST. of 1845, art. I, §§ 14; REPUB. TEX.

CONST. of 1836, Declaration of Rights, Sixteenth, *reprinted in* TEX. CONST. app. 482, 493–94. The *DeCordova* court stated that a "retroactive law" literally means a law that acts on things that are past. *See DeCordova,* 4 Tex. at 475. Observing that if this term were given its literal meaning, it would have such a broad reach as to be incapable of practical application, the *DeCordova* court held that it is unconstitutional to enact a statute that retroactively destroys or impairs vested rights, such as an accrued claim or a right to assert that a claim is barred by the statute of limitations. *See id.* at 473–80. The *DeCordova* court also stated that statutes modifying the remedy for a claim do not violate the constitution; however, statutes that take away all remedies for an accrued claim are unconstitutional. *See id.* at 479–80.

In applying the Texas Constitution's prohibition against retroactive laws, the Texas Supreme Court and this court have used the vested-rights analysis on numerous occasions to determine if a given statute constitutes a "retroactive law" that should be declared void. *See Subaru of America, Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 219–23 (Tex.2002) (holding that statute changing tribunal for resolving issues under the Texas Motor Vehicle Commission Code did not affect any vested rights and was not an unconstitutional retroactive law); *In re A.D.,* 73 S.W.3d 244, 247–49 (Tex.2002) (holding that statute would be an unconstitutional, retroactive law if it destroyed a vested right by eliminating a matured statute-of-limitations defense but concluding that statute in question did not do so); *Baker Hughes, Inc. v. Keco R. & D., Inc.,* 12 S.W.3d 1, 4–5 (Tex.1999) (holding that statute of limitations was unconstitutional retroactive statute as applied because it destroyed a vested right to assert a matured statute-of-limitations defense); *City of Tyler v. Likes,* 962 S.W.2d 489, 502–03 (Tex. 1997) (citing *DeCordova* and holding that

statute was not an unconstitutional retroactive law under vested-rights analysis); *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 559–61 (1916) (holding that statute was not unconstitutional retroactive law using vested-rights analysis); *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 251–54 (1887) (holding that, as applied, statute was unconstitutional retroactive law based on the vested-rights analysis); *In re S.C.S.,* 48 S.W.3d 831, 835 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (holding that amendment to statute was not an unconstitutional, retroactive law because the statute does not confer any vested right); *Price Pfister, Inc. v. Moore & Kimmey, Inc.,* 48 S.W.3d 341, 353–55 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (stating that, to establish that a statute is an unconstitutional, retroactive law a party must show that the statute's application would take away or impair vested rights under existing law and holding that statute did not affect any vested rights of appellant); *Zeolla v. Zeolla,* 15 S.W.3d 239, 242–43 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (stating that although Family Code does not define statutory term "retroactive effect," this term is commonly used to describe a law that takes away or impairs vested rights under existing law); *Reames v. Police Officers' Pension Bd.,* 928 S.W.2d 628, 631 (Tex.App.-Houston [14th Dist.] 1996, no writ) (stating that an unconstitutional retroactive law is "one which takes away or impairs vested rights acquired under existing laws" and holding that statute in question did not impair party's vested rights) (quotations omitted). The majority states that, in the *Wright* case, the Texas Supreme Court acknowledged problems with the vested-rights analysis, outlined alternatives to this analysis, and indicated that the vested-rights analysis should no longer be used. *See ante* at p. 528 (citing *Texas*

*Water Rights Comm'n v. Wright,* 464 S.W.2d 642, 648–49 (Tex.1971)).

In *Wright,* L.A. Wright, Myrlee McNary, and George McNary challenged the cancellation of their water permits. *See Wright,* 464 S.W.2d at 644. The Texas Water Rights Commission had canceled the permits under a 1957 statute because the permit owners had not used the permits for ten years. *See id.* The permit owners asserted that the statute was unconstitutionally retroactive as applied to them. *See id.* at 644–48. Before the 1957 statute took effect, a water permit could be canceled if it had been willfully abandoned for three consecutive years; however, the law required proof of a subjective intent to abandon the permit as well as three consecutive years of non-use. *See id.* at 644. The challenged 1957 statute allowed cancellation of water permits without any proof of subjective intent to abandon if the owner failed to use the water permit for ten consecutive years. *See id.* at 645. The Texas Supreme Court determined that the owners had vested rights to the beneficial, non-wasteful use of water but that they did not have a right to the non-use of water. *See id.* at 647–48. The challenged statute took effect six months into the ten-year period used to determine that the owners had willfully abandoned their water rights under the permits. *See id.* at 649. The *Wright* court determined that the owners had no right to an unlimited period of non-use of water and that the owners had nine and a half years after the effective date of the statute to use some water under the permits to avoid a finding of willful abandonment. *See id.* at 649–50. Rejecting the owners' constitutional challenges, the *Wright* court held that the 1957 statute's alteration of the standard for determining willful abandonment did not constitute an unconstitutional retroactive law. *See id.*

As to the legal standard used in *Wright,* the Texas Supreme Court cited various cases regarding the vested-rights analysis; it did not discuss the police-power legal standard or any other possible alternatives to the vested-rights legal standard. *See id.* at 649–50. The *Wright* court did not indicate that the vested-rights analysis should be discarded; rather, it used the vested-rights analysis to uphold the challenged statute, citing the *DeCordova* case in determining that nine and a half years was a reasonable period for the owners to have a chance to use their permits to avoid a finding of willful abandonment. *See id.* at 649 (citing *DeCordova,* 4 Tex. at 480). There is one paragraph in the *Wright* opinion in which the court cites four law review articles and notes that some legal scholars have tried to discover the underlying rationale for what makes a statute unconstitutionally retroactive. *See id.* at 649. Though the Texas Supreme Court recognized that efforts to catalogue cases have provided some assistance and also shown some confusion in the decisions, our high court did not suggest abandonment of the vested-rights analysis nor did it propose any other legal standard as a substitute. *See id.* at 648–50. The *Wright* case does not support a change from the well-established vested-rights analysis to a new police-power analysis.

The majority also relies on the Texas Supreme Court's opinion in *Barshop. See ante* at p. 529. In *Barshop,* our high court rejected various constitutional claims that the Edwards Aquifer Act was unconstitutional on its face, holding that the plaintiffs failed to establish that this statute, by its terms, always operates to unconstitutionally deprive them of their property rights in underground water. *See Barshop,* 925 S.W.2d at 627, 638. The *Barshop* plaintiffs asserted, among other things, that the challenged statute was an unconstitutional retroactive law under the

Texas Constitution. *See id.* at 633–34. The *Barshop* court began by recognizing that retroactive laws that impair vested rights violate the Texas Constitution. *See id.* at 633. Although the State asserted that the plaintiffs did not have vested rights in the water in question, the *Barshop* court did not address this argument. *See id.* at 625, 633–34. Instead, the court applied a police-power analysis, stating that "[a] valid exercise of the police power by the Legislature to safeguard the public safety and welfare can prevail over a finding that a law is unconstitutionally retroactive." *See id.* at 633–34. The only authorities cited by the *Barshop* court for this proposition are five court of appeals opinions and one Texas Supreme Court opinion. *See id.* Except for the *Texas State Teachers Ass'n* case, the parts of these opinions cited by *Barshop* are obiter dicta. *See Texas State Bd. of Barber Exam'rs v. Beaumont Barber Coll., Inc.,* 454 S.W.2d 729, 732 (Tex.1970) (stating, after concluding that barber college had no vested right to operate with less floorspace and equipment than required by new statute, that barber college's right was to be protected from legislation that constitutes an unreasonable exercise of the police power); *Texas State Teachers Ass'n v. State,* 711 S.W.2d 421, 424–25 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (presuming, despite expressed doubts, that teachers' certificates in question were vested rights and holding that constitutional prohibition against retroactive laws must yield to the state's right to safeguard the public welfare through valid exercise of its police power, citing *Kilpatrick* and *Wichita Engineering* ); *Ismail v. Ismail,* 702 S.W.2d 216, 222 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.) (stating that an overriding public interest justifies application of statute to property acquired before the enactment, but concluding that court was bound by prior Texas Supreme Court case, which held that legal principle contained in statute was the law in Texas even before the statute took effect); *Kilpatrick v. State Bd. of Registration for Prof'l Eng'rs,* 610 S.W.2d 867, 870–71 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.) (holding appellants had no vested rights that would be protected from retroactive laws but also citing *Wichita Engineering* for the statement that the constitutional protections against retroactive laws are not absolute and must yield to the state's right to safeguard public welfare); *State Bd. of Registration for Prof'l Eng'rs v. Wichita Eng'g Co.,* 504 S.W.2d 606, 608–09 (Tex.Civ.App.-Fort Worth 1973, writ ref'd n.r.e.) (stating that corporation had no vested right in using "engineering" in its name based on statute that was in effect when it was incorporated but stating that the constitutional protections against retroactive laws are not absolute and must yield to the state's right to safeguard public welfare); *Caruthers v. Bd. of Adjustment of City of Bunker Hill Village,* 290 S.W.2d 340, 345–50 (Tex.Civ. App.-Galveston 1956, no writ) (concluding property owners had no vested right to compel recognition of their planned subdivision in case in which parties did not assert an article I, section 16 violation, but stating that all property rights are subordinate to the valid and reasonable use of the police power). Nonetheless, the *Barshop* court stated that it agreed with the reasoning of these cases. The *Barshop* court did not reach the issue of whether the plaintiffs had vested rights, and it rejected the retroactivity challenge because it concluded that the Edwards Aquifer Act was "necessary to safeguard the public welfare of the citizens of this state." *Barshop,* 925 S.W.2d at 634.

The *Barshop* opinion supports the majority's application of a police-power analysis rather than the vested-rights analysis. But neither *Barshop* nor the cases cited therein mention or discuss section 29 of the Texas Bill of Rights. *See* TEX. CONST.

art. I, § 29. Under the plain meaning of this constitutional provision, the people of Texas have not given the Texas government the police power to enact any "retroactive law." *See* Tex. Const. Preamble, art. I, §§ 16, 29; *Dietz*, 940 S.W.2d at 89–90; *Bouillion*, 896 S.W.2d at 148–49; *Marshall*, 76 S.W.2d at 1010–11; *Fazekas*, 565 S.W.2d at 305. Although *Barshop* supports a police-power analysis, it does not mention or overrule prior Texas Supreme Court authority that uses the vested-rights analysis. *See, e.g., Wright*, 464 S.W.2d at 648–50; *Middleton*, 185 S.W. at 559–61; *Mellinger*, 3 S.W. at 251–54. Since *Barshop* was decided nearly a decade ago, the Texas Supreme Court and this court have used the vested-rights analysis without mentioning or discussing *Barshop*. *See, e.g., Subaru of America, Inc.*, 84 S.W.3d at 219–23; *In re A.D.*, 73 S.W.3d at 247–49; *Baker Hughes, Inc.*, 12 S.W.3d at 4–5; *Likes*, 962 S.W.2d at 502–03; *In re S.C.S.*, 48 S.W.3d at 835; *Price Pfister, Inc.*, 48 S.W.3d at 353–55; *Reames*, 928 S.W.2d at 631. Research indicates that *Barshop* is the only Texas Supreme Court case holding that a police-power type of analysis is appropriate for evaluating a claim that a statute violates the Texas Constitution's prohibition against retroactive laws. As an intermediate court of appeals, this court is bound by Texas Supreme Court precedent; however, *Barshop* is contradicted by several other Texas Supreme Court prece-

dents existing when *Barshop* was decided and by several such precedents decided after *Barshop*.[2] In this difficult position in which this court cannot possibly follow both *Barshop* and the other Texas Supreme Court precedents, the better course would be to follow the other precedents. Not only does the weight of authority rest in these cases, but these opinions discuss the issue in light of section 29 of the Texas Bill of Rights. Therefore, this court should apply the vested-rights analysis rather than a police-power analysis.

### The Vested-Rights Analysis

Both the Texas Supreme Court and this court have concluded that an accrued cause of action is a vested right. *See Likes*, 962 S.W.2d at 502; *Mellinger*, 3 S.W. at 253 ("When ... a state of facts exists as the law declares shall entitle a plaintiff relief in a court of justice on a claim which he makes against another ..., then it must be said that a right exists [and] has become fixed or vested...."); *Price Pfister, Inc.*, 48 S.W.3d at 354 (determining that, for purposes of retroactivity analysis under Texas Constitution, company had a vested right when its contract claim accrued); *but see Walls v. First State Bank of Miami*, 900 S.W.2d 117, 122 (Tex.App.-Amarillo 1995, writ denied) (stating that right does not become vested until claim is reduced to a final, nonreview-

---

**2.** The majority also cites other cases that are not persuasive or not on point as to this issue. *See Lebohm v. City of Galveston*, 154 Tex. 192, 275 S.W.2d 951, 954–55 (1955) (stating in dictum in case involving only a successful open courts challenge that legislature may withdraw common law remedy if it is a reasonable exercise of the police power); *City of Coleman v. Rhone*, 222 S.W.2d 646, 648 (Tex. Civ.App.-Eastland 1949, writ ref'd) (stating that the police power is broad in case that did not involve an alleged violation of the Texas Bill of Rights but only an assertion that a statute was not a reasonable exercise of the

police power); *City of Breckenridge v. Cozart*, 478 S.W.2d 162, 165 (Tex.Civ.App.-Eastland 1972 writ ref'd n.r.e.) (holding that shutting off of person's water services did not constitute a taking of property without due process of law and stating that statute authorizing such action was a valid exercise of the police power); *Martin v. Wholesome Dairy, Inc.*, 437 S.W.2d 586, 590–91 (Tex.Civ.App.-Austin 1969, writ ref'd n.r.e.) (discussing the police power in case involving alleged violations of Equal Rights and Due Course of Law provisions).

able judgment); *Houston Indep. Sch. Dist. v. Houston Chronicle Pub. Co.*, 798 S.W.2d 580, 589 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (indicating that right is not vested until lawsuit is filed and finally determined). This logic is also supported by the various cases holding that a right to a limitations defense becomes vested when the claim becomes barred by limitations, rather than when the party obtains a judgment to this effect that is final by appeal. *See, e.g., Baker Hughes, Inc.*, 12 S.W.3d at 4 (stating that it is well settled that a statute may not retroactively destroy a party's right to a limitations defense, which becomes vested after the claim is barred by limitations). Though some courts of appeals have stated that an accrued claim is not vested until it is reduced to a judgment final by appeal, these holdings are contrary to precedents binding on this court. *See Likes*, 962 S.W.2d at 502; *Mellinger*, 3 S.W. at 253; *Price Pfister, Inc.*, 48 S.W.3d at 354. Moreover, these holdings are not logically sound. If a judgment final by appeal is necessary, then parties whose claims accrued on the same day would have their entitlement to constitutional protection from retroactive statutes determined based in part on how expeditious the trial and appellate process happened to be in their particular lawsuits. That would not be reasonable.

Because Mrs. Robinson's claims accrued and were pending in the trial court when the Statute took effect, Mrs. Robinson held vested rights in these claims that could not be destroyed.[3] *See Likes*, 962 S.W.2d at

502; *Mellinger*, 3 S.W. at 253; *Price Pfister, Inc.*, 48 S.W.3d at 354. Crown Cork & Seal asserts that the Statute does not bar all of Mrs. Robinson's remedy for the claimed injuries because she can sue other companies not protected by the Statute. This argument lacks merit because Mrs. Robinson claims that the Statute retroactively destroyed her vested rights in her claims against Crown Cork & Seal, rather than any vested rights she might have to sue other entities. Crown Cork & Seal has cited no cases supporting the notion that the Texas Constitution permits a statute to retroactively destroy a vested right in an accrued claim if other parties may be liable on other claims seeking damages for the same injury. This argument lacks merit.[4]

In *Ieropoli v. AC & S Corp.*, the Pennsylvania Supreme Court addressed the constitutionality of a Pennsylvania statute limiting the successor asbestos-related liabilities of certain companies that, as applied, would have retroactively destroyed accrued tort claims against Crown Cork & Seal. *See* 577 Pa. 138, 842 A.2d 919, 932 (2004). Although *Ieropoli* involved the open courts provision of the Pennsylvania Constitution and a somewhat different Pennsylvania statute, the case has some persuasive value in evaluating the constitutional issue in the instant case. *See* 577 Pa. 138, 842 A.2d 919, 932 (2004). In *Ieropoli*, Pennsylvania's high court held that the Pennsylvania statute, as applied, offended the Pennsylvania Constitution. *See id.* at 929–32. Reversing and remand-

---

**3.** Furthermore, there is no merit in Crown Cork & Seal's argument that Mrs. Robinson's claims are statutory claims in which she has no vested rights under *Dickson v. Navarro County Levee Improv. Dist. No.3*, 135 Tex. 95, 139 S.W.2d 257, 259 (1940) and *Aetna Ins. Co. v. Richardelle*, 528 S.W.2d 280, 284 (Tex. Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.). Likewise, there is no merit in Crown Cork & Seal's assertion that the Statute is a

change in the conflict-of-laws rules, in which Mrs. Robinson has no vested right.

**4.** In addition, although the majority stresses the asbestos litigation crisis, the Texas Supreme Court has held that emergency conditions do not allow the Texas Legislature to constitutionally enact a statute that destroys vested rights. *See Marshall*, 76 S.W.2d at 1011.

ing the lower court, the Pennsylvania Supreme Court found that the Pennsylvania statute violated the open courts provision of the Pennsylvania Constitution by destroying all remedy for an accrued cause of action. *See id.* at 932. The *Ieropoli* court held that an accrued claim is a vested right that cannot be eliminated by subsequent legislation. *See id.* at 927–32,. In explaining why the statute violated the remedies clause of the Pennsylvania Constitution, the *Ieropoli* court stated:

> Before the Statute's enactment, each cause of action that [plaintiffs] brought against Crown Cork was a remedy—it was the vehicle by which [plaintiffs] lawfully pursued redress, in the form of damages, from Crown Cork for an alleged legal injury. But under the Statute, [plaintiffs] cannot obligate Crown Cork to pay them damages on those causes of action. In this way, each cause of action has been stripped of its remedial significance, as it can no longer function as the means by which [plaintiffs] may secure redress from Crown Cork. As a remedy, each cause of action has been in essence, extinguished. Under [the open courts provision of the Pennsylvania Constitution], however, a statute may not extinguish a cause of action that has accrued. Therefore, as [plaintiffs'] causes of action accrued before the Statute was enacted, we hold that the Statute's application to [plaintiffs'] causes of action is unconstitutional

*Id.* at 930. The Pennsylvania Supreme Court rejected the argument that because the plaintiffs could recover from other potential defendants, no cause of action had been extinguished. The court's logic in rejecting this point is persuasive:

> What this reasoning overlooks is the individual nature of a cause of action. A plaintiff does not assert one cause of action against multiple defendants. Rather, a plaintiff asserts one cause of action (or two or several causes of ac-

tion) against a single defendant ... Thus, the fact that the causes of action [plaintiffs] brought against Crown Cork's co-defendants are proceeding has no bearing on the Statute's unconstitutional effect on the accrued causes of action that [plaintiffs] brought against it. *Id.* Although the Pennsylvania Constitution is different from the Texas Constitution, both states use the vested-rights analysis and both constitutions prohibit statutes that retroactively eliminate accrued claims; therefore, the majority's distinctions between the *Ieropoli* decision and this case are not convincing. The majority states that "the most important differences appear in the statutes themselves," noting that the Pennsylvania statute was not as narrowly drawn as the Texas statute, was not crafted to encompass "only the most innocent successor corporations," and did not impose the requirement that a corporation must have purchased the asbestos division before May 13, 1968, and must not have manufactured asbestos itself. *Ante* at p. 535. But, if the enactment of the Statute violates a constitutional prohibition on retroactive laws, these points are not relevant to the analysis.

In sum, by enacting this expressly retroactive statute, our Legislature created a new substantive defense to successor liability and made it immediately effective in all pending cases, destroying Mrs. Robinson's vested rights in her accrued tort claims against Crown Cork & Seal. The Statute, as applied to Mrs. Robinson, is unconstitutional because it violates the Texas Bill of Rights's prohibition against retroactive laws.

CONCLUSION

Based on the structure and plain language of the Texas Constitution as well as the weight of binding precedent, this court should utilize the vested-rights analysis to

determine whether the Statute is an unconstitutional retroactive law as applied to Mrs. Robinson's claims against Crown Cork & Seal. This analysis compels the conclusion that, as applied to her, the Statute retroactively destroys Mrs. Robinson's vested rights in accrued tort claims against Crown Cork & Seal. Therefore, to this extent, the Statute violates article I, section 16 of the Texas Constitution.